## PATRICIA H. MAYFIELD, COMMISSIONER OF LABOR *v.* GOSHEN VOLUNTEER FIRE COMPANY, INC. (SC 18378)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Harper, Js.

---

Argued April 18—officially released August 2, 2011

*Richard T. Sponzo,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* former attorney general, and *Philip M. Schulz,* assistant attorney general, for the appellant (plaintiff).

*Ian E. Bjorkman,* for the appellee (defendant).

*Opinion*

HARPER, J. The plaintiff, Patricia H. Mayfield, the commissioner of labor (commissioner), appeals from the judgment of the trial court dismissing for lack of subject matter jurisdiction the commissioner's warrant application seeking to inspect the premises of the defendant, Goshen Volunteer Fire Company, Inc. (fire company), to investigate whether the fire company was in compliance with the requirements of Connecticut's Occupational Safety and Health Act (act),[1] General Statutes § 31-367 et seq.[2] The commissioner contends that the trial court improperly concluded that the fire company does not fall within the act's definition of a covered

---

[1] As we explain later in this opinion, Connecticut's act works in concert with the federal Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. (2006).

[2] The commissioner appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

employer as "the state and any political subdivision thereof . . . ." General Statutes § 31-367 (d). We agree with the trial court and, accordingly, affirm its judgment.

The record reveals the following undisputed facts and procedural history. The fire company is a nonprofit, nonstock membership corporation that serves as the primary source of fire suppression for the town of Goshen (town).[3] All members of the fire company are volunteers; they receive no salary or pension but are eligible to receive workers' compensation benefits from the town. The fire company has its own bylaws and constitution, under which its members elect officers, who are in turn responsible for the company's operations; the town plays no role in officer selection or operations. The town has an oral contract with the fire company for fire protection, which may be terminated on sixty days' notice. The fire company leases its land, which it previously gave to the town, and its building from the town for $1 per year. Many of the company's vehicles are town financed, though the company has purchased some through independent fundraising.

The present litigation arose after the commissioner was denied access to the fire company's firehouse for the purpose of conducting an inspection to see if it was in compliance with safety and health requirements. In response, the commissioner applied to the Superior Court for a warrant to inspect the firehouse pursuant to General Statutes § 31-374 (a). The warrant application alleged that a videotape of members of the fire company conducting a "live burn" training exercise without wearing full protective gear required under the respiratory protection standards of the act provided probable cause

---

[3] Neighboring fire companies act as first responders in areas of the town that are far from the fire company's firehouse. Mutual aid agreements with other municipalities also provide supplemental fire coverage for the town.

to believe that conditions in the firehouse posed a threat to health or safety.

The fire company moved to dismiss the warrant application for want of subject matter jurisdiction. After a hearing, the trial court granted the motion, holding that the fire company falls outside the scope of the act, which grants the commissioner jurisdiction only over an "[e]mployer," which is defined in § 31-367 (d) as "the state and any political subdivision thereof . . . ." The trial court reasoned that, because it is not a unit of government but, rather, an independent corporation, the fire company does not fall within the meaning of "political subdivision" in § 31-367 (d) and therefore is not an employer under the act. Accordingly, the trial court rendered judgment dismissing the commissioner's warrant application. This appeal followed.

The commissioner claims that the trial court improperly limited its analysis to the question of whether the fire company itself is a political subdivision of the state, contending that the fire company should be deemed a covered employer if it is an agency of a political subdivision. The commissioner further contends that the fire company's status as an agency of the town should be determined by applying the "functional equivalent" test developed in case law to determine whether a nominally private corporation is a "[p]ublic agency"; General Statutes § 1-200 (1); for purposes of the Freedom of Information Act. General Statutes § 1-200 et seq. The commissioner contends that, under this test, the fire company is an agency of the town and, accordingly, an employer subject to the act. The fire company responds by claiming that the trial court properly construed the plain and unambiguous meaning of the term political subdivision in § 31-367 (d) to exclude the fire company and that the act's text does not support reliance on the functional equivalent test. We agree with the fire company.

Before turning to the merits of the commissioner's claim, we first address the proper standard for this court's review. "The standard of review for a court's decision on a motion to dismiss is well settled. A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo." (Internal quotation marks omitted.) *Tayco Corp.* v. *Planning & Zoning Commission*, 294 Conn. 673, 679, 986 A.2d 290 (2010). The issue in this case, namely, whether the trial court properly concluded that the fire company is not a political subdivision for purposes of § 31-367 (d), is one of statutory construction. It is therefore a question of law over which we exercise plenary review. Id.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Pasquariello* v.

*Stop & Shop Cos.*, 281 Conn. 656, 663–64, 916 A.2d 803 (2007).

We begin with General Statutes § 31-369, which sets forth the act's scope. That section provides in relevant part: "This chapter applies to *all employers*, employees and places of employment in the state except the following: (1) Employees of the United States government; and (2) working conditions of employees over which federal agencies other than the United States Department of Labor exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health." (Emphasis added.) General Statutes § 31-369 (a). Despite what would appear at first blush to be broad coverage, § 31-367 clarifies and constrains the act's scope by specifying in relevant part: " 'Employer' means the state and any political subdivision thereof"; General Statutes § 31-367 (d); and '[e]mployee' means any person engaged in service to an employer in a business of his employer . . . ." General Statutes § 31-367 (e). Because the definition of employee requires that there be a statutory employer, the threshold inquiry regarding the coverage of § 31-369 (a) must be whether the fire company can be characterized properly as an employer in § 31-367 (d) by virtue of falling within the bounds of "the state and any political subdivision thereof . . . ."

The act does not define the term political subdivision. "Such silence does not, however, necessarily equate to ambiguity . . . ." *Manifold* v. *Ragaglia*, 272 Conn. 410, 419, 862 A.2d 292 (2004). Rather, "[t]he test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 654, 969 A.2d 750 (2009).

Examination of other labor provisions included in title 31 of the General Statutes also does not yield any

definition of political subdivision. In the absence of a statutory definition, we turn to General Statutes § 1-1 (a), which provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." "To ascertain the commonly approved usage of a word, we look to the dictionary definition of the term." (Internal quotation marks omitted.) *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 678, 911 A.2d 300 (2006). Black's Law Dictionary, quoting directly from an opinion of this court that predates the act's passage, *State ex rel. Maisano* v. *Mitchell*, 155 Conn. 256, 263, 231 A.2d 539 (1967), has defined political subdivision as "[a] division of the state made by proper authorities thereof, acting within their constitutional powers, for purpose of carrying out a portion of those functions of state which by long usage and inherent necessities of government have always been regarded as public."[4] Black's Law Dictionary (5th Ed. 1979).

The legislature's use of this term throughout the General Statutes accords with this dictionary definition and more specifically enumerates the entities covered by it. Pursuant to General Statutes § 28-1 (12), which governs civil emergency preparedness and emergency services, for example, " '[p]olitical subdivision' means any city, town, municipality, borough or other unit of local government." See also General Statutes § 7-195 (a) ("[a]s used in this section and sections 7-196 to 7-201, inclusive, 'unit of local government' means a town or political subdivision thereof and 'political subdivision' means a city, borough or district within a town"); General Stat-

---

[4] The most recent edition of that dictionary defines the term more tersely as "[a] division of a state that exists primarily to discharge some function of local government." Black's Law Dictionary (9th Ed. 2009).

utes § 7-479a (a) (" '[l]ocal public agency' means any political subdivision of the state, including any city, town or borough or any district as defined in § 7-324 or any metropolitan district or any municipal district created under § 7-330"). These and other provisions establish a core set of entities—cities, towns, and other units of local government—that plainly fall within the meaning of political subdivision. As this court noted in our leading case interpreting the term political subdivision, decided before the enactment of the act:[5] "The word 'state' means 'a body of people occupying a definite territory and politically organized under one government.' . . . On this theory, the subdivision of a state would be a body of people less in number than the total number in the state, politically organized, and occupying a part of the territorial area of the state— hence a city, borough or town." (Citations omitted.) *State ex rel. Maisano* v. *Mitchell*, supra, 155 Conn. 263. This general definition finds further support in article tenth, § 1, of the Connecticut constitution, which provides: "The general assembly shall by general law delegate such legislative authority as from time to time it deems appropriate to towns, cities and boroughs relative to the powers, organization, and form of government of such political subdivisions."

The fire company plainly does not fall within this core definition. Indeed, the law governing nonstock corporations provides that such corporations "shall not include towns, cities, boroughs or any municipal corporation or department thereof." General Statutes § 33-

[5] See also, e.g., *Dugas* v. *Beauregard*, 155 Conn. 573, 578, 236 A.2d 87 (1967) ("[t]he attributes which are generally regarded as distinctive of a political subdivision are that it exists for the purpose of discharging some function of local government, that it has a prescribed area, and that it possesses authority for subordinate self-government through officers selected by it"); *Norwalk* v. *Daniele*, 143 Conn. 85, 86–88, 119 A.2d 732 (1955) (political subdivision includes cities and towns in addition to state officers and departments).

1002 (8). As a nonstock corporation, the fire company is not a municipality, municipal department or other unit of local government. It is a distinct corporate entity.

We are mindful that the legislature has not always limited the meaning of the term political subdivision to units of local government. When the legislature has intended to expand the meaning of political subdivision beyond its traditional scope, however, it not only has done so expressly, but also has tailored its definition to reflect the particular purpose of the statutory scheme at issue. For purposes of Connecticut's SustiNet health care plan, for example, General Statutes § 19a-710 (9) defines "[n]onstate public employer" as "a municipality or other political subdivision of the state, including a board of education, quasi-public agency or public library." General Statutes § 7-462 (b), concerning the reinstatement of municipal employees after military leave, defines political subdivision for purposes of that section as "any town, city, borough, district, school board, board of education, public social service or public welfare agency, public corporation, housing authority, redevelopment or urban renewal board or commission, or other public authority or public agency established by law." Speaking most directly to the issue of nonprofit fire companies, General Statutes § 7-467, concerning collective bargaining rights, specifies that " '[m]unicipal employer' means any political subdivision of the state, including any town, city, borough, district, district department of health, school board, housing authority or other authority established by law, *a private nonprofit corporation which has a valid contract with any town, city, borough or district to extinguish fires and to protect its inhabitants from loss by fire,* and any person or persons designated by the municipal employer to act in its interest in dealing with municipal employees . . . ." (Emphasis added).

These provisions indicate that the term political subdivision can encompass entities beyond units of local government, but only under the limited terms and circumstances provided by specific statutes. By their own terms, the broader definitions apply only to specific provisions, and the definitions cumulatively do not cohere into an expansive general definition of political subdivision. While § 7-467 demonstrates that the legislature *can* include nonprofit fire companies in the definition of political subdivision, the legislature's decision expressly to incorporate nonprofit fire companies into this single provision offers persuasive evidence that the term does not ordinarily sweep so broadly. The absence of a statutory definition in the act at issue in the present case, tailored specifically to the purposes of the act, reflects the legislature's intent that the traditional meaning of political subdivision should apply to § 31-367 (d). Cf. *Doucette* v. *Pomes*, 247 Conn. 442, 463–64, 724 A.2d 481 (1999) (declining to construe "insurer" under Connecticut Insurance Guaranty Act [act] to include self-insurers in light of legislature's inclusion of self-insurer in definitions of insurers in other provisions of General Statutes and its omission of that term in act).

In construing § 31-367 (d), we also bear in mind that the act operates in conjunction with related regulatory regimes. In § 31-369 (b), the act dictates that "[n]othing in this chapter shall be construed to supersede or in any manner affect any workers' compensation law . . . ." Although, as we previously noted, the fire company's members are eligible to receive workers' compensation benefits from the town if they are injured while performing fire duties, applying the traditional meaning of political subdivision to the fire company does not affect the availability of benefits for individual firefighters. Indeed, the manner in which the legislature extended such benefits provides further evidence that this traditional meaning properly applies to § 31-367 (d). The fire

company's members are not deemed employees under the Workers' Compensation Act, General Statutes § 31-275 et seq., itself; rather, the legislature adopted separate provisions in another chapter of the General Statutes governing municipal police and fire protection to extend such benefits to fire company members. The legislature provided in General Statutes § 7-314a (a) that "active members of volunteer fire departments . . . shall be *construed* to be employees of the municipality for the benefit of which volunteer fire services . . . are rendered while in training or engaged in volunteer fire duty . . . and shall be compensated in accordance with the provisions of chapter 568 [Workers' Compensation Act] for death, disability or injury incurred while in training for or engaged in volunteer fire duty . . . ." (Emphasis added).

While the classification of volunteer firefighters as municipal employees for purposes of workers' compensation provides evidence of the legislature's desire to protect volunteer firefighters, it offers no basis for characterizing the fire company as a political subdivision.[6] Indeed, the explicit inclusion of volunteer firefighters in municipal workers' compensation plans in § 7-314a

---

[6] The commissioner did not attempt to serve a warrant on the town itself, the town has never been a party in this litigation, and the commissioner has not pursued a theory based on direct municipal employment between the town and the fire company's members or based on the town's ownership of land, buildings or equipment. We recognize that volunteer firefighters may have relationships with a municipality independent of the relationship between their fire company and the political subdivision that the fire company serves. See General Statutes § 7-148 (c) (5) (A) (conferring authority on municipalities to establish pension system for municipal employees and volunteer firefighters); General Statutes § 7-308 (b) (providing municipal indemnification of volunteer firefighters in work-related lawsuits); see also General Statutes § 1-110 (2) (defining "[s]tate or municipal employee" to include "any person, whether appointed or under contract, who provides services for a city, town or other political subdivision of the state for which a pension is provided"). We, therefore, do not express any opinion as to whether volunteer firefighters can be considered employees of political subdivisions for purposes of § 31-367 or other statutory provisions.

(a) reconfirms the legislature's ability, where it so chooses, to account for the unusual status of volunteer firefighters through the judicious construction of legal fictions. See *Going* v. *Cromwell Fire District, Fire Dept.*, 159 Conn. 53, 60, 267 A.2d 428 (1970) ("[a]n historical review of the legislation pertaining to volunteer firemen suggests the conclusion that the General Assembly created a fictitious relationship of employer-employee between volunteer firemen and the municipality only to ensure the payment of benefits to volunteer firemen similar to those provided for regular firemen"); id., 60–61 (refusing to construe volunteer firefighter as municipal employee for purposes of General Statutes § 31-310). The legislature has not called for any such differential treatment of volunteer firefighters in § 31-367 (d). Harmonizing the workers' compensation and occupational safety statutes thus does not compel, or even justify, importing the former's exceptional, fictitious treatment of volunteer firefighters into the latter's general definition of political subdivision.

The act also operates alongside the federal Occupational Safety and Health Act, codified at 29 U.S.C. § 651 et seq. (2006).[7] General Statutes § 31-372 (a) provides in relevant part that "[t]he [labor] commissioner shall

[7] "The [state act] became effective May 30, 1973. Public Acts 1973, No. 73-379. Section 6 (a) of that act . . . provided for the adoption of federal standards recognized by the United States Secretary of Labor under the authority of the [federal Occupational Safety and Health Act] . . . . The federal standards . . . preempted state standards until January, 1975, when by agreement between the state and federal regulatory authorities, the federal government withdrew its regulations from Connecticut, leaving the state agency with the sole enforcement power under the state [act]. Subsequently, the state [act] was limited so that it applied only to state and local governments. Public Acts 1977, No. 77-610, § 1, effective July 1, 1978, now set out as General Statutes § 31-367 (d)." *Wendland* v. *Ridgefield Construction Services, Inc.*, 184 Conn. 173, 175–76 n.1, 439 A.2d 954 (1981). As a result, the legislature eliminated state jurisdiction over occupational safety and health in the private sector, returning the protection of Connecticut's private sector employees to the federal government's jurisdiction. Id.

provide for the adoption of all occupational health and safety standards, amendments or changes adopted or recognized by the United States Secretary of Labor under the authority of the [federal] Occupational Safety and Health Act of 1970. . . ." Through this provision, the state adopts the federal regulatory regime in its entirety, creating an unusually close correlation between the state and federal statutes. While we are not bound to apply federal interpretations of parallel provisions of federal law to § 31-367 (d), in the interest of coordination between the comparable federal and state regulatory regimes, we do not overlook this final source of legislative context.

Under § 652 (5) of title 29 of the United States Code (2006), the federal Occupational Safety and Health Administration has jurisdiction over every "person [in the United States] engaged in a business affecting commerce who has employees," with the exception of "the United States . . . or any [s]tate or political subdivision of a [s]tate." Where the language of our state act so closely mirrors that of its federal analogue, "the judicial interpretation frequently accorded the federal [Occupational Safety and Health Act] is of great assistance and persuasive force in the interpretation of our own [act]." *West Hartford Education Assn., Inc.* v. *DeCourcy*, 162 Conn. 566, 579, 295 A.2d 526 (1972). The federal courts have developed a two-pronged test for determining whether an entity falls within this federal exception. Under the test, "[a]ny entity which has been (1) created directly by the [s]tate, so as to constitute a department or administrative arm of the government, or (2) administered by individuals who are controlled by public officials and responsible to such officials or to the general electorate, shall be deemed to be a '[s]tate or political subdivision thereof' under section 3 (5) of the [federal Occupational Safety and Health Act]," placing it outside of federal jurisdiction. See annot., 153 A.L.R. Fed. 303, 312 (1999), citing 29 C.F.R. § 1975.5 (b).

The federal test is consistent with our General Statutes and our case law indicating that political subdivisions generally are derivative of the constitutional authority vested in the state itself. See, e.g., *State ex rel. Maisano* v. *Mitchell,* supra, 155 Conn. 263. This test does not contradict our conclusion that the act's definition in § 31-367 (d) limiting employers to "the state and political subdivisions thereof" plainly and unambiguously excludes the fire company. The fire company is chartered as an independent nonprofit corporation and was not created by any act of legislation; none of its members is directly accountable either to the state or to the electorate; and the fire company's contract with the town may be dissolved at any time with proper notice. While the town does provide significant financial support for the fire company, that financial relationship does not make the fire company part of the town, nor does it authorize the town to govern the fire company's membership or operations.

The commissioner urges us to adopt a different test altogether. Under her theory, a political subdivision includes any public agencies associated with it. Public agencies, in turn, may be private entities that are deemed the functional equivalent of a public agency. Specifically, the commissioner asks us to apply the "functional equivalent" test that this court has adopted in the context of the Freedom of Information Act to determine whether a nominally private entity is a "public agency" for purposes of that act.[8] We conclude that

[8] See *Connecticut Humane Society* v. *Freedom of Information Commission,* 218 Conn. 757, 760, 591 A.2d 395 (1991) ("[i]n determining whether an entity is the functional equivalent of a public agency, we consider the following criteria: [1] whether the entity performs a governmental function; [2] the level of government funding; [3] the extent of government involvement or regulation; and [4] whether the entity was created by the government" [internal quotation marks omitted]); *Board of Trustees* v. *Freedom of Information Commission,* 181 Conn. 544, 553–54, 436 A.2d 266 (1980) (court's first adoption of this test).

there is no basis for adopting the commissioner's proposed test.

Pursuant to § 1-2z, which instructs us to read a statute's language "in relationship to other statutes," the applicability of the proposed functional equivalent test depends, as a threshold matter, on there being a relationship between the Freedom of Information Act and the act at issue in the present case. See, e.g., *Commissioner of Public Safety* v. *Freedom of Information Commission*, 301 Conn. 323, 338–39, 21 A.3d 737 (2011). For the purpose of defining political subdivision, we find no meaningful relationship between these acts.

The textual distance between the Freedom of Information Act and the act at issue in the present case is so great as to defy translation. Section 1-200 (1) sets forth an expansive definition of public agency that includes not only "any political subdivision of the state and any state or town agency, any department, institution, bureau, board, commission, authority or official of the state or of any city, town, borough, municipal corporation, school district, regional district or other district or other political subdivision of the state"; General Statutes § 1-200 (1) (A); but also "[a]ny person to the extent such person is deemed to be the *functional equivalent of a public agency* pursuant to law . . . ." (Emphasis added.) General Statutes § 1-200 (1) (B). The act in the present case, by contrast, provides no textual basis for extending its scope to include the functional equivalents of covered employers. Indeed, this court previously has not extended the functional equivalent test outside of the Freedom of Information Act. But see *Gordon* v. *H.N.S. Management Co.*, 272 Conn. 81, 98, 861 A.2d 1160 (2004) (considering functional equivalent test when crafting different test to determine whether corporate entity is arm of state entitled to assert sovereign immunity as defense).

Moreover, the text of the act provides no practical justification for incorporating the functional equivalent test into the act. The Freedom of Information Act protects citizens of the state from the ill effects of governmental secrecy, and the functional equivalent test in turn prevents the state from skirting that act's disclosure requirements by authorizing private agents to operate in its stead. "[A] policy of liberal access to public records would necessarily be thwarted if 'public agencies' were given a narrow construction . . . ."[9] *Board of Trustees* v. *Freedom of Information Commission*, 181 Conn. 544, 551, 436 A.2d 266 (1980). The act, by contrast, uses the term political subdivision to draw a jurisdictional line determining whether a state or a federal agency will enforce a uniform set of rules; no public policy is thwarted by restricting state jurisdiction to entities that fall within the technical bounds of "the state and any subdivision thereof" as required by § 31-367 (d). See footnote 7 of this opinion.

Given that we find no meaningful relationship between the functional equivalent test of the Freedom of Information Act and the act at issue, under § 1-2z we have no basis for disturbing the plain meaning of § 31-367 (d) by importing what is effectively an extratextual analytic framework. In order to bring the fire company within the scope of the act, the commissioner asks

---

[9] A similar public policy concern animates analysis of the state actor doctrine for purposes of state liability under § 1983 of title 42 of the United States Code and similar statutes. Even given the policy impetus toward liberal construction, the United States Court of Appeals for the Second Circuit and the United States District Court for the District of Connecticut have developed a conflicted and fact-specific jurisprudence to address the status of volunteer fire companies as state actors. See *Janusaitis* v. *Middlebury Volunteer Fire Dept.*, 607 F.2d 17, 18 (2d Cir. 1979) (expulsion of fire company member considered state action when fire company membership was governed by town selectmen and fire company was heavily financed by town); *McNally* v. *Stewart*, 618 F. Sup. 2d 168, 177–78 (D. Conn. 2009) (no state action when independently incorporated volunteer fire company partially financed by town expelled company member).

us to transform § 31-367 (d) not only by expansively interpreting its definition of political subdivision to include all public agencies, but also by further expanding that broad interpretation to encompass private entities that are the functional equivalent of public agencies. Section § 1-2z does not accommodate such statutory alchemy.

We address, finally, the commissioner's suggestion in her reply brief and at oral argument before this court that reading § 31-367 (d) as excluding the fire company from the act produces an absurd result because of the inherent dangerousness of the work the fire company performs.[10] There is, we recognize, reason for great concern regarding the health and safety of our volunteer firefighters, who routinely risk their lives without compensation for the public good. The legislature accordingly has taken steps to protect volunteer firefighters by indemnifying them against work-related lawsuits and by providing workers' compensation coverage. General Statutes §§ 7-308 (b) and 7-314a (a). We also recognize that these statutory protections amplify the question of why volunteer firefighters should not be covered by a regulatory regime intended to prevent—rather than merely mitigate the financial effects of—harmful accidents. This policy concern, however, does not rise to the level of absurdity. Approximately one half of our sister states have chosen not to extend their version of the Occupational Safety and Health Act to public employers generally. See United States Dept. of Labor, Occupational Safety and Health Administration, Directory of States with Approved Occupational Safety and

---

[10] The commissioner also raises a concern that reading political subdivision as excluding the fire company might in turn exclude all town departments and agencies from coverage under the act. We first note that it is difficult to conceive of a situation in which a paid employee of a town department or agency is not an employee of the town itself. Moreover, we do not hold in the present case that the term political subdivision excludes such subordinate municipal entities.

Health Plans, available at http://www.osha.gov/dcsp/
osp/states.html (last visited July 19, 2011).[11] This fact
strongly suggests that it is neither absurd nor unwork-
able to forgo regulation of entities not covered by the
federal Occupational Safety and Health Administra-
tion.[12] Moreover, volunteer fire departments more
closely governed by municipalities; see, e.g., General
Statutes § 7-301;[13] may fall within state jurisdiction

[11] The Internet sources to which we cite in this opinion were accessed
and verified immediately before the date of publication of this opinion for
the purpose of ensuring accuracy. All such sources are on file with this court.

[12] We also note that occupational safety and health rules are not the sole
source of regulations governing fire companies. For example, environmental
protection rules regarding hazardous materials may apply to volunteer work-
ers not covered by the federal Occupational Safety and Health Act. See 29
C.F.R § 1910.120 (q); 40 C.F.R. §§ 311.1 and 311.2.

[13] General Statutes § 7-301 provides: "Any town may provide by ordinance
for the protection of property within its limits from fire and for the establish-
ment of a town fire department and for the management, discipline and
control thereof by the board of selectmen or, if there is a town council, by
the town council, or by a board of fire commissioners of such number,
chosen in such manner and for such terms as the ordinance provides. The
board of selectmen, town council or board of fire commissioners may make
regulations for the conduct of the fire department and may appoint, discipline
and remove for cause shown all employees of the department and purchase
supplies and equipment necessary for its operation; provided, if the ordi-
nance so provides, the board of selectmen, town council or board of fire
commissioners shall enter into an agreement with any volunteer fire com-
pany or companies within the town for the protection thereof from fire
on such conditions as to financial assistance and the observance of the
regulations of the board of selectmen, town council or board of fire commis-
sioners as such ordinance prescribes; and provided no town fire department
established under the provisions of this section shall supersede any volunteer
fire company which is the owner of any building, fire apparatus or other
property without having first come to an agreement with such company with
regard to the disposition of and compensation for such building, apparatus or
other property. Such town may, at any meeting specially warned for the
purpose, make appropriations and lay taxes for the support thereof; but
this section shall not be operative within the limits of any city, borough or
incorporated fire district which has an established fire department. Nothing
in this section shall prevent any town, city, borough or incorporated fire
district from appropriating funds to a volunteer fire company or companies
for services rendered or to be rendered within the confines of such town,
city, borough or district by such fire company or companies, provided such
town, city, borough or incorporated fire district shall deem it in the public
interest to do so."

under our act, and those independent fire companies with paid employees are regulated by the federal Occupational Safety and Health Administration.[14] In light of these considerations, as well as the cost of regulatory enforcement, we cannot conclude that the plain and unambiguous parameters of jurisdiction of § 31-367 (d) produce a result that is absurd or unworkable.

We are mindful that, because of its all-volunteer status and the circumstances of its creation, the fire company may be in a unique class that falls outside of the jurisdiction of both the state and the federal Occupational Safety and Health Act. Though such an outcome may well be attributable to an inadvertent omission in the statutory scheme, we cannot substitute our speculative judgment for the plain and unambiguous meaning of the text. "Courts may not by construction supply omissions . . . or add exceptions merely because it appears that good reasons exist for adding them. . . . It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature."[15] (Internal quotation marks omit-

[14] A policy letter promulgated by the federal Occupational Safety and Health Administration clarifying an agency instruction as it pertained to emergency response training for firefighters indicates that "[the federal Occupational Safety and Health Act] does not generally cover volunteer firefighters. While [that federal act] would cover volunteer companies established as private sector entities, with one or more paid employees, it does not cover state and local government employees." United States Dept. of Labor, Occupational Safety and Health Administration, Standard Interpretations (November 7, 2008) (letter from Richard E. Fairfax, Director, Directorate of Enforcement Programs, to Philip C. Stittleburg, Chairman, National Volunteer Fire Council, available at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIONS&p_id=27409.

[15] The commissioner asks us to afford weight to a New York appellate case holding that New York's equivalent of our act covers volunteer firefighters. While we may sympathize with the policy concerns animating that opinion; see *Hartnett* v. *Ballston Spa*, 152 App. Div. 2d 83, 547 N.Y.S.2d 902 (1989), appeal dismissed 75 N.Y.2d 863, 552 N.E.2d 167, 552 N.Y.S.2d 919, appeal denied, 75 N.Y.2d 711, 556 N.E.2d 1116, 557 N.Y.S.2d 309 (1990); the text of § 31-367 (d) simply does not bear the interpretation set forth therein. Moreover, because the text does not provide an anchor for specifically

ted.) *Greco* v. *United Technologies Corp.*, 277 Conn. 337, 350, 890 A.2d 1269 (2006).

The judgment is affirmed.

In this opinion the other justices concurred.

addressing the limited subset of fire companies presently outside the reach of occupational safety and health regulations, any policy based rule we might devise to cover the fire company here would risk being overinclusive or underinclusive, disrupting the regulatory scheme created by the legislature.