45 A.3d 627 (2012)
305 Conn. 488
FAIRCHILD HEIGHTS, INC.
v.
Nancy DICKAL et al.
No. 18560.
Supreme Court of Connecticut.
Argued September 22, 2011.
Decided June 26, 2012.
*628 Abram Heisler, for the appellants (defendants).
Thomas T. Lonardo, with whom, on the brief, was Colin P. Mahon, Meriden, for the appellee (plaintiff).
J.L. Pottenger, Jr., New Haven, Kathleen M. Flaherty, Newington, and Raphael L. Podolsky, Hartford, filed a brief for the Jerome N. Frank Legal Services Organization et al. as amici curiae.
ROGERS, C.J., and NORCOTT, PALMER, ZARELLA, McLACHLAN and HARPER, Js.
McLACHLAN, J.
In this certified appeal, we review *629 General Statutes § 21-80a,[1] which protects residents of mobile manufactured home parks by limiting the availability of summary process actions in certain circumstances. Under § 21-80a, if a resident proves that he or she engaged in one or more of the protected activities enumerated in § 21-80a (a) within the six months preceding the park owner's eviction proceeding, the owner may not maintain a summary process action against that resident unless the owner can show that one of the exceptions specified in § 21-80a (b) applies.[2] The defendants, Nancy Dickal, Alan Dickal and Lisa Dickal, residents of a mobile manufactured home park owned by the plaintiff, Fairchild Heights, Inc., appeal from the judgment of the Appellate Court affirming the trial court's judgment of possession in favor of the plaintiff.[3]Fairchild Heights, Inc. v. Dickal, 118 Conn.App. 163, 164-65, 983 A.2d 35 (2009).
On appeal, the defendants claim that judgment of possession should be granted in their favor because the plaintiff's summary process action was barred under § 21-80a. Specifically, they argue that the Appellate Court improperly interpreted *630 § 21-80a (b)(1) to allow the plaintiff to maintain the summary process action against them, notwithstanding their protected conduct, upon a showing that they violated a material provision of the applicable rental agreement. Although we agree with the defendants that the Appellate Court's interpretation of § 21-80a (b)(1) is not permitted by the statutory language, we nevertheless conclude that the Appellate Court properly determined that § 21-80a (b)(1) would allow the plaintiff to maintain a summary process action against the defendants. Accordingly, we conclude that the Appellate Court properly affirmed the trial court's judgment of possession in favor of the plaintiff.
The Appellate Court opinion set forth the following relevant facts. "The plaintiff is the owner of a mobile manufactured home park consisting of roughly 103 mobile home sites. The defendants are the longtime owners and occupants of a mobile manufactured home located in the plaintiff's park. On or about December 3, 2003, the plaintiff and the defendants executed a one year lease agreement set to commence on January 1, 2004, in connection with this mobile home site. This was the last formally executed lease between the parties. The terms of this lease, however, remained effective throughout the duration of the defendants' residency at the mobile home park.[4]
"The lease agreement expressly stated that the monthly charge for parking excess motor vehicles on the defendants' mobile home site was $30 per vehicle. Additionally, the mobile home park rules and regulations, which were appended to and expressly incorporated into the lease by reference, set a limit of two motor vehicles per site without subjecting the resident to the additional vehicle parking fees.
"The record reveals that from the outset of when the lease went into effect, the defendants parked more than two motor vehicles on their mobile home site in violation of the terms and conditions as expressed in the lease. At trial, Nancy Dickal conceded that at the beginning of 2004, three vehicles were parked on her mobile home site. She further testified that in October, 2004, her family began regularly parking four vehicles on the site.
"The plaintiff sent the defendants several bills seeking payment for their parking more than two motor vehicles on the mobile home site. These additional parking fees, however, were never paid by the defendants. Nevertheless, Nancy Dickal testified that for the duration of their residency at the mobile home park, her family parked four motor vehicles on their site....
"The quarrel between the plaintiff and the defendants was not entirely centered on motor vehicle parking rules and regulations. In February, 2005 ... Nancy Dickal assisted in organizing a residents association on behalf of the individuals residing in the plaintiff's mobile home park. Shortly thereafter, Nancy Dickal was elected as president of the association. A little more than one year later, in or about July, 2006, the residents association brought an action against the plaintiff concerning a number of alleged housing and maintenance violations in the mobile home park....
"In the midst of this dispute,[5] on August 3, 2007, the plaintiff served the defendants *631 with a formal written notice indicating that the defendants were in breach of their rental agreement. Specifically, the notification stated that the defendants were in violation of the mobile home park rules and regulations appended to their 2004 lease regarding motor vehicle parking. The warning gave the defendants thirty days to remedy their alleged violation. The defendants took no remedial action, and on September 8, 2007, the plaintiff served them with a notice to quit possession of the premises by November 19, 2007.
"On December 7, 2007, the plaintiff commenced this summary process action against the defendants. The complaint, mirroring the initial formal notification and subsequent notice to quit, alleged that the defendants had failed to comply with the park rules and regulations by parking more than two motor vehicles at their site." Id., at 165-67, 983 A.2d 35. In response, the defendants asserted the following special defenses: (1) that the plaintiff did not apply the park rules and regulations fairly and evenly in violation of General Statutes § 21-70(d)(3); (2) that the remedy of summary process was unavailable to the plaintiff because the defendants had engaged in activities protected pursuant to § 21-80a and the summary process action was retaliatory in violation of General Statutes § 47a-33; and (3) that the doctrine of inequitable forfeiture barred the eviction of the defendants.
The Appellate Court additionally set forth the relevant procedural background. "The [trial] court concluded that all ... of [the defendants'] special defenses lacked merit. In its memorandum of decision, the court found that the rules and regulations concerning motor vehicle parking were uniformly applied to the park residents. The court, in support of this finding, referred to evidence of similar eviction proceedings the plaintiff had brought against other park residents who also neglected to make payments in connection with excess motor vehicle parking. The court also concluded that the plaintiff's summary process proceeding was not within the purview of § 21-80a because the underlying action was not tainted by a retaliatory motive. The plaintiff's action, rather, was `essentially a continuing effort by the plaintiff to enforce the rules and regulations and resolve a problem that arose long before any of [Nancy] Dickal's involvement in lawsuits against the plaintiff or her other activities.' Finally, the court concluded that the defendants' `"extraordinary"' inequitable forfeiture defense did not apply in these circumstances. Accordingly, the court rendered judgment [of] possession in favor of the plaintiff." Id., at 167-68, 983 A.2d 35.
The defendants appealed from the judgment of the trial court to the Appellate Court, challenging the trial court's conclusions on each of the asserted special defenses. The Appellate Court affirmed the trial court's conclusion that the park rules and regulations were applied fairly to park residents because the trial court's findings were supported by the evidence and, therefore, were not clearly erroneous. Id., at 170, 983 A.2d 35. The Appellate Court also upheld the trial court's conclusion that the summary process action was not barred by § 21-80a. Id., at 178, 983 A.2d 35. That court concluded that, even if the defendants had engaged in conduct protected under § 21-80a (a), the exception under § 21-80a (b)(1), which permits a park owner to proceed with a summary *632 process action when a resident "is using the dwelling unit or the premises ... for a purpose which is in violation of the rental agreement," applied. In particular, the court concluded that § 21-80a (b)(1) was ambiguous; Fairchild Heights, Inc. v. Dickal, supra, 118 Conn.App. at 174, 983 A.2d 35; and broadly interpreted the relevant language to encompass situations in which a "resident's conduct is in violation of a material provision of the rental agreement," such as the defendants' parking of excess vehicles in breach of the rental agreement. Id., at 173, 983 A.2d 35. Finally, the Appellate Court affirmed the trial court's conclusion that the defendants were not entitled to a defense of inequitable forfeiture due to their "wilful" breach of the rental agreement and the doctrine of unclean hands. Id., at 179, 983 A.2d 35. This appeal followed. Additional facts will be set forth as necessary.
The parties agree that if a resident has engaged in conduct protected by subsection (a) of § 21-80a, subsection (b) of that statute provides the exclusive means for circumventing the resulting bar to a landlord's summary process action. See also Correa v. Ward, 91 Conn.App. 142, 147, 881 A.2d 393 (2005) (construing analogous language in General Statutes §§ 47a-20 and 47a-20a of Landlord and Tenant Act). What is at issue in this appeal is the scope of these exceptions; in particular, the exception that applies when a "resident is using the dwelling unit or the premises... for a purpose which is in violation of the rental agreement...." General Statutes § 21-80a (b)(1). The defendants argue that the Appellate Court improperly interpreted § 21-80a (b)(1). They maintain that the language clearly and unambiguously requires a showing that the tenant used the property as a whole for the purpose of violating the rental agreement, such as using the property for a commercial purpose or converting the single unit site into a multi-unit site. The defendants posit that they are entitled to the protection of § 21-80a (a) because the parking of extra vehicles on their lot is not "using the dwelling unit or the premises ... for a purpose which is in violation of the rental agreement"; General Statutes § 21-80a (b)(1); as they urge us to interpret it. In contrast, the plaintiff contends that the Appellate Court properly interpreted the statutory language to encompass the defendants' breach of the rental agreement, and, accordingly, that the Appellate Court properly affirmed the trial court's judgment. We agree with the plaintiff that the Appellate Court properly affirmed the trial court, but not on the basis stated by the Appellate Court.
Our resolution of the present case requires us to determine whether the Appellate Court properly concluded that, by parking excess cars in violation of the rental agreement, the defendants were "using the dwelling unit or the premises... for a purpose which is in violation of the rental agreement" pursuant to § 21-80a (b)(1).[6] As such, this issue presents a question of statutory interpretation over which our review is plenary. State v. Courchesne, 296 Conn. 622, 668, 998 A.2d 1 (2010). "The principles that govern statutory *633 construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.... In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.... When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.... A statute is ambiguous if, when read in context, it is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) Wilton Meadows Ltd. Partnership v. Coratolo, 299 Conn. 819, 824-25, 14 A.3d 982 (2011).
We begin with the language of the statute. Section 21-80a (b) provides: "Notwithstanding the provisions of subsection (a) of this section, if permitted by subdivision (1) of subsection (b) of section 21-80, the owner may maintain an action to recover possession of the premises if: (1) The resident is using the dwelling unit or the premises for an illegal purpose or for a purpose which is in violation of the rental agreement or for nonpayment of rent; (2) the condition complained of was caused by the wilful actions of the resident or another person in his household or a person on the premises with his consent; or (3) the owner seeks to recover possession pursuant to section 21-80 on the basis of a notice which was given to the resident before the resident's complaint." Section 21-80a (b) thus indicates that a park owner may maintain a summary process action against a resident who has engaged in conduct protected under § 21-80a (a) if: (1) the action was permitted by General Statutes § 21-80(b)(1); and (2) one of the enumerated exceptions applied.
Because § 21-80a (b) expressly limits the application of the exceptions provided therein to summary process actions that are "permitted by subdivision (1) of subsection (b) of section 21-80," we first consider the statute in relation to § 21-80.[7] *634 Section 21-80 articulates grounds for dispossessing residents of mobile manufactured home parks. In particular, § 21-80(b)(1)(C) specifies that a park owner may dispossess a resident who is in "[m]aterial noncompliance ... with the rental agreement or with rules or regulations adopted under section 21-70...." In other words, to evict residents who own their own mobile home on the basis of noncompliance with the rental agreement or park rules and regulations, such noncompliance must be at least material.
Because § 21-80(b)(1)(C) already requires a showing of material noncompliance with the rental agreement to justify an eviction, the legislature must have intended § 21-80a (b)(1) to contemplate an additional requirement, such that the exception would encompass some, but not all, conduct that is in material noncompliance with the lease. Otherwise, the protection that arises upon engaging in one of the activities specified in § 21-80a (a) would be rendered a nullity with respect to residents who own their own mobile home.[8]
To determine the scope of § 21-80a (b)(1), we turn to the requirement that a park owner show that the resident is "using the dwelling unit or the premises... for a purpose which is in violation of the rental agreement...." "[W]e are mindful that [i]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions.... [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous.... Because [e]very word and phrase [of a statute] is presumed to have meaning... [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) Connecticut Podiatric Medical Assn. v. Health Net of Connecticut, Inc., 302 Conn. 464, 474, 28 A.3d 958 (2011). Although neither § 21-80a nor the Mobile Manufactured Home Parks Act, of which § 21-80a is a part, defines the meaning of the phrase "using the dwelling unit or the premises," the rule against superfluity prohibits us from according such a broad interpretation to § 21-80a (b)(1) that the phrase is rendered meaningless. For instance, a broad interpretation of § 21-80a (b)(1)  permitting eviction, notwithstanding a resident's protected conduct, whenever the resident *635 has violated any term of the rental agreement  would read the language "using the dwelling unit or the premises" out of the statute. The provision would have the same meaning and effect as an exception that stated simply that a park owner could maintain a summary process action "if the resident is in violation of the rental agreement."
Accordingly, we look to the definition of the term "using" in order to give independent meaning to this language. "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." General Statutes § 1-1(a). "To ascertain the commonly approved usage of a word, we look to the dictionary definition of the term." (Internal quotation marks omitted.) Mayfield v. Goshen Volunteer Fire Co., 301 Conn. 739, 746, 22 A.3d 1251 (2011). The verb to "use" means "to put into action or service ... [to] employ...." Merriam-Webster's Collegiate Dictionary (11th Ed.2011). As a transitive verb, it requires and places emphasis on an object. Focus on the object  in this case, the dwelling unit or premises  is therefore critical to giving full effect to the term using. Thus, we conclude that § 21-80a (b)(1) encompasses material violations of lease provisions that regulate the use of the dwelling unit or premises. In contrast, material violations of provisions that do not entail the active employment of the property would not fall within the exception.[9] The legislature reasonably could have determined that a park owner should be permitted to maintain a summary process action in spite of a resident's protected conduct in these circumstances because such a use of the premises, unlike other conduct that may constitute material noncompliance with the rental agreement, could affect the safety and welfare of other residents.
"Purpose," in turn, means "something set up as an object or end to be attained...." Id. The language "purpose which is in violation of the rental agreement"; General Statutes § 21-80a (b)(1); indicates that the end obtained by the resident's use of the premises must constitute a violation of the lease.
Although we agree with the defendants that the Appellate Court's interpretation of § 21-80a (b)(1) was overinclusive, we disagree with the defendants' narrow interpretation, limiting the exception to cases where there is "an overall improper use of the dwelling unit or the premises for a purpose in violation of the lease." We are mindful that "remedial statutes should be construed liberally in favor of those whom the law is intended to protect"; Dysart Corp. v. Seaboard Surety Co., 240 Conn. 10, 18, 688 A.2d 306 (1997); and, accordingly, that exceptions therefrom should be construed narrowly. Insofar as this court has recognized that the General Assembly enacted statutes regulating mobile home parks to protect mobile home residents from park owners' abuses; see *636 Eamiello v. Liberty Mobile Home Sales, Inc., 208 Conn. 620, 647, 546 A.2d 805 (1988) ("[P]ark owners have a monopoly and as we have seen throughout our society monopolies often result in abuses.... [This bill] helps the people who live in these mobile home parks...." [Internal quotation marks omitted.]), appeal dismissed, 489 U.S. 1002, 109 S.Ct. 1104, 103 L.Ed.2d 169 (1989); 15 H.R. Proc., Pt. 4, 1972 Sess., pp. 1707-1708, remarks of Representative Richard A. Dice; this remedial purpose must be balanced against the rights and duties of a park owner. For instance, the owner has a right to expedient summary process; see Young v. Young, 249 Conn. 482, 492, 733 A.2d 835 (1999) (referring to "right to expedient summary process" pursuant to Landlord and Tenant Act); and a duty to maintain the park in a safe and habitable condition for all of the park's residents. See, e.g., General Statutes § 21-82(a).[10] We believe that our interpretation of § 21-80a strikes the proper balance between the rights and duties of both parties. It provides adequate protection to residents who have engaged in activities enumerated by § 21-80a (a) while preserving the park owner's statutory remedy of summary process in those cases in which the residents' actions may affect the safety and welfare of other residents. Alternatively, under the defendants' interpretation, a resident who has engaged in protected conduct could materially violate the lease without fear of being subject to eviction for a six month period, regardless of the burdens that that conduct could place on the owner and other park residents.
In sum, we disagree with the Appellate Court's determination that § 21-80a (b)(1) is ambiguous and that a broad interpretation is necessary to balance the interests of park owners and residents. On the contrary, when a resident contends that § 21-80a (a) bars a summary process action brought pursuant to § 21-80(b)(1)(C), we conclude that the park owner may maintain such action nevertheless by establishing that the resident is: (1) in material noncompliance with the lease; and (2) using the premises for a purpose that violates the rental agreement. Accordingly, we conclude that the Appellate Court improperly interpreted § 21-80a (b)(1) broadly to allow a park owner to dispossess a resident whose conduct was merely "in violation of a material provision of the rental agreement." Fairchild Heights, Inc. v. Dickal, supra, 118 Conn. App. at 175, 983 A.2d 35.
With this interpretation of § 21-80a (b)(1) in mind, we turn to the merits of the claim that the defendants were "using the dwelling unit or the premises ... for a purpose which [was] in violation of the rental agreement," by parking excess vehicles on the premises. First, we observe that the plaintiff initiated the present summary process action on the basis of material noncompliance with the rental agreement, as permitted by § 21-80(b)(1)(C). In rendering judgment of possession in favor of the plaintiff, the trial court necessarily found that the defendants' *637 conduct constituted material noncompliance, and the defendants did not appeal this part of the trial court's decision.
Second, although the trial court did not expressly determine whether parking excess vehicles on one's lot constituted, pursuant to § 21-80a (b)(1), a "[use of] the dwelling unit or the premises ... for a purpose which is in violation of the rental agreement" as we interpret it, we believe that the trial court's findings compel the conclusion that the defendants' violation did indeed fall within this subdivision of § 21-80a (b). In particular, the trial court found that the rental agreement limited the number of motor vehicles on each mobile home lot to two vehicles before the imposition of an additional fee. The court also found that the defendants violated this provision by continually parking three or four vehicles on the premises[11] over the course of several years without ever paying the requisite fee. Additionally, the trial court recognized that a park owner has a genuine need to control the number of vehicles in the park, explaining that "[e]xcess vehicles are commonly parked on common property or impinge upon the roads throughout the park making snow removal and maintenance difficult." Thus, it is clear that the defendants were using their lot for the purpose of parking additional vehicles, which was a material violation of the terms of the rental agreement.
On the basis of these findings, we conclude that the defendants were: (1) in material noncompliance with the lease; and (2) "using the dwelling unit or the premises ... for a purpose which [was] in violation of the rental agreement...." General Statutes § 21-80a (b)(1). Although our interpretation of the relevant statutory language differs from that of the Appellate Court, even under our narrower interpretation, the Appellate Court's ultimate conclusion that the defendants' violation was encompassed by § 21-80a (b) was proper.
The judgment of the Appellate Court is affirmed.
In this opinion ROGERS, C.J., and NORCOTT and ZARELLA, Js., concurred.
HARPER, J., with whom PALMER, J., joins, dissenting.
I fully agree with the majority that the Appellate Court misconstrued General Statutes § 21-80a (b)(1), which provides an exception to the statutory bar to an eviction action commenced within six months of a mobile park tenant engaging in specified protected activities upon proof that the tenant is "using the dwelling unit or the premises ... for a purpose which is in violation of the rental agreement," to mean simply that the tenant has violated a material provision of the rental agreement. I disagree, however, with the majority's alternate basis for affirming the Appellate Court's judgment, under which the majority construes this statutory exception to permit eviction when the tenant has materially violated a lease provision that regulates the use of the dwelling unit or premises, such that the conduct could affect the safety or welfare of other tenants, and determines that this standard was met in the present case. In my view, the majority's *638 construction not only is unsupported by the text of § 21-80a[1] and related provisions of landlord tenant law, it undermines the remedial purpose of the statute. Moreover, there is neither a finding by the trial court to support a conclusion that this newly articulated standard has been met nor facts in the record to support such a conclusion. Construing the exception consistent with the text, I would conclude that the plaintiff, Fairchild Heights, Inc., has not demonstrated that the conduct of the defendants, Nancy Dickal, Alan Dickal and Lisa Dickal, in parking more than two vehicles on the premises, constitutes use for a purpose in violation of the parties' rental agreement that would overcome the presumption of retaliatory eviction. I further would conclude that the trial court improperly determined that, because the present action was part of a "continuing effort" by the plaintiff to resolve a violation of the rental agreement that predated the defendants' protected activities,[2] the defendants could not prevail on a claim of retaliatory eviction under § 21-80a. Accordingly, I would reverse the Appellate Court's judgment.

I
The majority properly recognizes that the Appellate Court's construction would render the protection under § 21-80a (a) meaningless because proof that a mobile park tenant who owns his or her home has *639 violated a "material term" of the lease is a lesser standard of proof than that required to evict such a tenant under the usual eviction process, which generally requires "material noncompliance" with the lease or certain laws. See footnote 3 of this dissenting opinion. Thus, the majority properly concludes that § 21-80a (b) must limit the circumstances under which an eviction may be pursued, despite the tenant's engagement in protected activities, to a smaller subset of activities than the universe of material noncompliance. Where the majority and I part company is in determining what constitutes that more limited universe.
The majority initially concludes that "using the dwelling unit or the premises ... for a purpose which is in violation of the rental agreement" under § 21-80a (b)(1) encompasses "material violations" of lease provisions that regulate the use, meaning active employment, of the dwelling unit or the premises. The majority later explains that its interpretation would permit eviction for conduct that may affect the "safety and welfare" of other residents, reasoning that this interpretation is in accord with the landlord's obligation to maintain the mobile park in a safe and habitable condition. I address each of these points in turn.
At the outset, I observe that the majority's initial interpretation either fails to give any effect to the word "purpose" or effectively replaces it with the word "material," a term used nowhere in § 21-80a. "[W]e have long held that `[i]nterpreting a statute to render some of its language superfluous violates cardinal principles of statutory interpretation'"; Okeke v. Commissioner of Public Health, 304 Conn. 317, 328, 39 A.3d 1095 (2012); and, reading the term "purpose" out of this part of the statute cannot be reconciled with the legislature's use of the same term in another exception in § 21-80a (b)(1), "using the dwelling unit or the premises for an illegal purpose...." See Brennan v. Brennan Associates, 293 Conn. 60, 83, 977 A.2d 107 (2009) ("[it] is a familiar principle of statutory construction that [when] the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance" [internal quotation marks omitted]), quoting Connecticut Light & Power Co. v. Dept. of Public Utility Control, 266 Conn. 108, 123, 830 A.2d 1121 (2003). Indeed, the majority makes no attempt to do so. Moreover, given that the term "material" is twice used in a directly related statute; see General Statutes § 21-80(b)(1)(B) and (C) (prescribing "[m]aterial noncompliance" ground for eviction);[3] see also General Statutes § 21-80a (b) (referring to § 21-80); we ordinarily would presume that the legislature intends a different meaning where it has used different terms relating to the same subject. Cf. Saunders v. Firtel, 293 Conn. 515, 527, 978 A.2d 487 (2009) ("when a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject ... is significant to show that a different intention *640 existed" [internal quotation marks omitted]). Had the legislature intended the result the majority reaches, it readily could have stated "using the dwelling unit or the premises in material violation of the rental agreement" or even "using the dwelling unit or the premises in violation of ... § 21-80," which prescribes conditions for evicting mobile home park tenants. Therefore, it is improper either to fail to give independent meaning to the essential term "purpose" or to substitute the term "material."
More fundamentally, it is difficult to ascertain any meaningful difference between the effect of the Appellate Court's interpretation, which the majority acknowledges is inconsistent with the purpose of § 21-80a, and the majority's initial interpretation. Specifically, the majority's interpretation of § 21-80a (b)(1) would protect from retaliatory eviction only those tenants who had not materially violated a provision in their lease or those who had materially violated a lease provision but in a manner that did not involve the use of either their dwelling unit or their premises. The first group of tenants would not be subject to eviction in any event, because the conduct would not meet the material noncompliance standard required to bring an eviction action generally.[4] See footnote 3 of this dissenting opinion. The second group would encompass so few tenants due to the limited violative conduct as to render the statutory protection essentially meaningless.[5] Simply put, it is not rational to assume that the legislature intended such a limited effect with respect to this remedial scheme.
Because the majority's initial construction of § 21-80a (b)(1) cannot be squared with the statutory text or the legislative intent, I assume that the specific type of conduct it cites  that which creates a risk to the safety and welfare of other residents  narrows the scope of that construction. This more limited construction, however, also has substantive flaws.
The majority, citing Merriam-Webster's Collegiate Dictionary (11th Ed.2011), acknowledges that the common meaning of purpose is "something set up as an object or end to be attained...." (Internal quotation marks omitted.) It is self-evident, however, that the object or end of a tenant's activity is not to create an unsafe condition, although such a result may be the effect of the object to be obtained. Therefore, the majority's construction ascribes an unnatural meaning to the statute.
In addition, the terms safety and welfare appear nowhere in § 21-80a (b). Such concerns are expressly addressed, however, elsewhere in the landlord tenant eviction laws. Specifically, the legislature has authorized the eviction of tenants who have engaged in conduct that creates health or safety risks to other tenants, but it has imposed more stringent conditions for evicting tenants who are deserving of heightened protection. Compare General Statutes § 47a-23 (a)(F) (lessor)[6] and *641 General Statutes § 21-80(a)(1) (mobile park tenants who lease their home from park owner)[7] with General Statutes § 47a-23c (b)(1)(C) (elderly, blind or disabled lessors)[8] and General Statutes § 21-80(b)(1)(B) (mobile park residents who own their mobile home). One group entitled to such heightened protection is mobile home park residents who own their home, like the defendants in the present case, who can be evicted upon proof of "[m]aterial noncompliance ... with any statute or regulation materially affecting the health and safety of other residents or materially affecting the physical condition of the park...." General Statutes § 21-80(b)(1)(B). Notably, this standard is higher than the one articulated by the majority in two ways, both in terms of its dual emphasis on materiality and the legal source of the requisite violation. Given that the legislature expressly has addressed eviction for conduct that creates the very risk identified by the majority, presumably the legislature would have either used the same language in § 21-80a (b)(1), used comparable language, or expressly referred to § 21-80(b)(1) had it intended to create a safety and welfare exception in § 21-80a (b)(1).[9]
Even if it were appropriate for this court to put a gloss on § 21-80a (b)(1) in furtherance of an important public policy, which it is not, the majority's strained interpretation is not necessary to ensure the safety and welfare of other residents. Although the majority is correct that landlords have an obligation to ensure that their premises are safe and habitable, other legal remedies are available to arrest the conduct that creates such risks without thwarting the purpose of § 21-80a, which is to protect residents who seek to remedy, through various legal channels, unsafe or unlawful conduct by their landlord. For example, a landlord may seek injunctive relief, even on an ex parte basis if the circumstances so require. See General Statutes §§ 52-471 and 52-473. If the circumstances require urgent action, such relief may be obtained more expediently than through a summary process action.[10] Additionally, tenants commonly and effectively address issues relating to quiet enjoyment by complaints to law enforcement *642 officials. Furthermore, rental agreements also may provide other means short of eviction to rectify conduct in violation of the agreement. For example, under the parties' rental agreement, the plaintiff apparently never invoked its right to tow an "improperly parked car ... that creates a hazard or inconvenience to [the defendants'] neighborhood or community."
Finally, even if the majority were correct that the presumption of retaliatory eviction is overcome by proof that a tenant has materially violated the rental agreement by using the premises in a manner that creates a risk to the safety and welfare of other residents, the record in the present case does not support a conclusion that this standard has been met. The record reveals the following undisputed facts adduced at the summary process hearing. The rental agreement at issue expressly permits tenants to park in excess of two vehicles, subject to obtaining permission and paying a monthly fee. The plaintiff had offered the defendants a lease under which they would have been permitted to park more than two cars on their lot at no additional fee, as long as they agreed to pay back fees for an earlier period of time for which the plaintiff had billed them for keeping excess vehicles.[11] Other tenants of the plaintiff park up to five cars on the premises. Simply put, when the conduct at issue would have been permitted had the defendants paid a fee, that conduct cannot reasonably be deemed a health and safety risk. When the same conduct providing the basis for the eviction action is engaged in by other tenants, with either the landlord's express permission or acquiescence, that conduct reasonably cannot be deemed a health and safety risk. Finally, the plaintiff's failure to tow away any of the defendants' vehicles during the four years that they were in noncompliance with the rental agreement, when it has the right to tow improperly parked cars that create a hazard or inconvenience, demonstrates that the plaintiff did not view the defendants' conduct as creating a risk to the safety or welfare of other tenants.
The majority mistakenly relies on the following statement by the trial court as a finding that demonstrates that its newly articulated standard has been met: "Excess vehicles are commonly parked on common property or impinge upon the roads throughout the park, making snow removal and maintenance difficult." There are several problems with this reliance. First, it is apparent from the context of this statement that the trial court was addressing the defendants' claim that the plaintiff's two vehicle rule was unreasonable.[12] Second, neither the statement itself nor the testimony cited in support of this statement addresses the defendants' conduct. Even if one were to infer that *643 the common practice referred to by the trial court includes conduct by the defendants, there is nothing to indicate whether they materially contributed to this problem. Therefore, in my view, the majority not only has misconstrued § 21-80a (b)(1), but it also improperly has determined that its standard has been satisfied.

II
In light of this conclusion, I turn to the question of whether, under a proper construction of § 21-80a (b)(1), the Appellate Court's judgment affirming the judgment of the trial court in favor of the plaintiff should be affirmed. In my view, the meaning of the pertinent exception, both generally and as applied to the facts of the present case, is relatively straightforward.
Section 21-80a (b)(1) permits a mobile home park owner to overcome the presumption that it is evicting a mobile park tenant for engaging in activities protected under subsection (a) of that statute by demonstrating, inter alia, that "[t]he resident is using the dwelling unit or the premises for an illegal purpose or for a purpose which is in violation of the rental agreement or for nonpayment of rent...." (Emphasis added.) As we previously have discussed, the common meaning of "purpose" is "something set up as an object or end to be attained...." (Internal quotation marks omitted.) Thus, the ultimate object toward which use of the property is directed must be fundamentally contrary to the set of ultimate objects that the rental agreement contemplates. In essence, the question of whether there is a use for a "purpose" in violation of the rental agreement is a question of contract interpretation in which we seek to ascertain the intention of the parties. See 19 Perry Street, LLC v. Unionville Water Co., 294 Conn. 611, 622-23, 987 A.2d 1009 (2010) ("[A] lease is a contract, and, therefore, it is subject to the same rules of construction as other contracts.... Ordinarily the parties' intent is a question of fact.... Where a party's intent is expressed clearly and unambiguously in writing, however, the determination of what the parties intended ... is a question of law [over which our review is plenary]." [Citation omitted; internal quotation marks omitted.]). Where the contract does not expressly set forth the scope of permissible ends, as a matter of basic contract interpretation we look to the rental agreement as a whole to ascertain the parties' purpose in making that agreement. As in other circumstances in which this court has articulated the purpose of various types of contracts, we look not only to specific terms but also to the overarching end intended to be achieved by the collective force of those terms.[13]
Two important textual clues further illuminate the meaning of the pertinent exception. *644 The conduct at issue is linked in the conjunctive with two other acts, namely, "using the dwelling unit or the premises for an illegal purpose ... or for nonpayment of rent...." General Statutes § 21-80a (b)(1). This linkage suggests that the legislature intended each of the three categories to describe similarly egregious conduct. "Where a provision contains two or more words grouped together, we often examine a particular word's relationship to the associated words and phrases to determine its meaning pursuant to the canon of construction noscitur a sociis." (Internal quotation marks omitted.) McCoy v. Commissioner of Public Safety, 300 Conn. 144, 159, 12 A.3d 948 (2011). This view is bolstered by the legislature's use of the term "purpose" in two of the three acts described. Because using the dwelling unit or the premises for an illegal purpose and failing to pay rent are both patent violations of fundamental tenant obligations, the third category  use "for a purpose which is in violation of the rental agreement"  reasonably must construed to refer to a comparably fundamental violation.
In the present case, the rental agreement contains provisions unambiguously reflecting that the agreement's fundamental purpose is to lease a parcel of land for the placement of a dwelling, in particular, a single mobile home. Thus, for example, we can state as a matter of law that it would violate the purpose of the agreement to use the property for commercial purposes or for multiple dwellings.[14] In addition, use of the property for noncommercial purposes wholly inconsistent with maintaining a residence would violate the purpose of the rental agreement.
In rejecting the proposition that the statute should be given its "literal" meaning; Fairchild Heights, Inc. v. Dickal, 118 Conn.App. 163, 177, 983 A.2d 35 (2009); the Appellate Court had two responses, both of which I consider. First, the Appellate Court agreed that this literal construction was plausible; id., at 174, 983 A.2d 35; but it concluded that it would not strike the proper balance between landlord and tenants' rights, as intended by the legislature. Id., at 177-78, 983 A.2d 35. In so concluding, the Appellate Court relied on the 1976 legislative history relating to the Landlord and Tenant Act; General Statutes § 47a-1 et seq.; reasoning that this act's "broad purpose of balancing the interests of landlords and tenants applies equally to the statutory scheme governing mobile manufactured home site owners and mobile home residents who rent such home sites." Fairchild Heights, Inc. v. Dickal, supra, at 175, 983 A.2d 35. The Appellate Court overlooks, however, the fact that the legislature unambiguously struck a different balance for mobile park tenants than for other tenants, as is clearly reflected in the different burdens of proof for the defense of retaliatory eviction for the two classes. Compare General Statutes § 47a-33 (providing affirmative defense to tenant when landlord brought eviction action "solely" because tenant attempted to remedy, by lawful means, violation of certain statutes, regulations or ordinances) with General Statutes § 21-80a (a) (prescribing presumption of retaliatory eviction of mobile park tenant when action brought within six months of tenant's engagement in broader class of specified protected activities); see also General Statutes § 21-80a (d) ("[n]othing in this section shall be construed to in any way limit the [retaliatory eviction] defense provided *645 in section 47a-33"). A different balance is justified in part because most mobile park tenants have property interests that other tenants do not. See 34 H.R. Proc., Pt. 22, 1991 Sess., p. 8512, remarks of Representative Douglas C. Mintz (stating when explaining purpose of Public Acts 1991, No. 91-383, which included what was codified as § 21-80a, that "[m]ost mobile home park residents own their homes but rent a space on which the home sits"). Indeed, the legislative history for No. 72-186 of the 1972 Public Acts, which created the first laws governing the licensure and regulation of mobile home parks, reveals the legislature's concern about mobile park owners' abuse of tenants' rights and the fact that mobile park tenants largely are comprised of a more vulnerable population than the general tenant population, such as the elderly and low income families. See 15 H.R. Proc., Pt. 4, 1972 Sess., pp. 1704, 1707-1709; 15 S. Proc., Pt. 5, 1972 Sess., pp.2068-2069.
Second, the Appellate Court reasoned that "an overly literal and excessively narrow reading of § 21-80a (b)(1) would yield... an irrational result, as it could seriously limit an owner's ability to care for his property, as well as emasculate the duty to protect the quiet enjoyment of other tenants." Fairchild Heights, Inc. v. Dickal, supra, 118 Conn.App. at 177, 983 A.2d 35. As I previously have noted, however, there are other means short of eviction to protect these interests. Moreover, by giving § 21-80a (b)(1) the literal and narrow reading that its text compels, we shield tenants from retaliatory eviction while they are seeking to remedy harmful conditions created by the landlord, which in turn yields a benefit to all tenants. Finally, the narrow reading of § 21-80a (b)(1) does not permanently shield a tenant from eviction for lease violations, but only for a sufficient period to vindicate their claim of wrongful conduct. Accordingly, I disagree with the reasons proffered by the Appellate Court in rejecting a narrow construction of § 21-80a (b)(1).
I therefore turn to the facts in the present case to determine whether, consistent with the "literal" construction of § 21-80a (b)(1), the defendants were using the premises for a "purpose which is in violation of the rental agreement" by parking three or four vehicles on the premises. The parties' rental agreement has sections addressing "Permitted Uses" and "Resident's Covenants" that relate to the use and occupancy of the premises. Neither the subject of parking generally nor the number of vehicles that may be kept on the premises specifically is mentioned in the "Resident's Covenants" section. Under the "Property Leased and Permitted Uses" section of the parties' rental agreement, there is a place where the defendants were to indicate the number of registered vehicles located on their lot; they indicated three. The subject of parking is addressed further in the section of the agreement entitled "Term and Rental." In that section, after setting forth the "basic" rent for leasing the property, ten categories of "items of additional rent" are listed. The sixth item sets forth a $30 monthly fee "[f]or additional motor vehicle(s) subject to leasing per lot (see Rules and Regulations) at the leased premise during the month provided parking space is available and prior park approval is obtained."[15] The rules and regulations set a limit of two vehicles without additional charge.
*646 It is clear from the terms of the parties' rental agreement that the defendants were not using the premises in violation of a "purpose" of the agreement. The purpose for which the defendants were using the premises is parking. Parking is a permitted use under the agreement. The mere fact that the defendants failed to comply with the conditions for parking in excess of two vehicles does not change this ultimate fact. The rules authorize the defendants to keep two vehicles and permit them to keep additional vehicles as long as they obtain permission and pay a fee. Although the defendants clearly violated this rule, I fail to see how conduct that expressly is permitted, subject to certain preconditions, can violate the purpose of the rental agreement simply because those preconditions were not met.[16] In other words, parking more vehicles than authorized, in and of itself, does not change the purpose of the use  parking, a permitted use  to some other purpose. If the defendants were, by contrast, parking large numbers of unregistered or junked vehicles, one might characterize the purpose of the use not as parking but as maintaining a junkyard or storage lot. Such uses clearly would constitute purposes that are in violation of the rental agreement. Those are not the facts here.[17]
Extratextual evidence further demonstrates that parking more than two vehicles cannot reasonably be characterized as use in violation of the purpose of the agreement. As I previously have noted, other tenants were parking more than two vehicles on the premises without paying additional fees, and the plaintiff apparently did not avail itself of its right under the rental agreement to tow an "improperly parked car ... that creates a hazard or inconvenience to [the defendants'] neighborhood or community." Therefore, it is clear that the defendants' act of parking up to four vehicles did not constitute using the premises for a purpose in violation of the lease. Accordingly, the plaintiff did not demonstrate that its eviction action falls within the scope of the exception to the presumption of retaliatory eviction under § 21-80a (b)(1).

III
Although my conclusions in part I and II of this dissenting opinion address the ground on which the Appellate Court affirmed the trial court's judgment, for reasons that are not apparent, the Appellate Court did not address the actual ground on which the trial court rendered judgment for the plaintiff. Following oral argument before this court, we ordered the parties to submit supplemental briefs to address the basis of the trial court's decision. I therefore also briefly address that basis and conclude that the Appellate Court's judgment also cannot be affirmed on the basis on which the trial court rejected the defendants' claim of retaliatory eviction.
The trial court concluded as follows: "As to the claim that the plaintiff's action against the defendant[s] is retaliatory, Nancy Dickal testified that the parties *647 were in dispute over the motor vehicle issue commencing in 2004. [Nancy] Dickal and others were defendants in summary process actions which were either settled or withdrawn following negotiations. The [defendants] continued to object to the extra charge and attempts by the plaintiff to negotiate a settlement were not fruitful.... While ... Nancy Dickal claims that the plaintiff's present action is in retaliation for her being instrumental in forming a tenants organization in February, 2005, and in instituting a lawsuit against the plaintiff in 2006, as well as other complaints to state and municipal authorities, it appears to the court that the present action is essentially a continuing effort by the plaintiff to enforce the rules and regulations and [to] resolve a problem that arose long before any of [Nancy] Dickal's involvement in lawsuits against the plaintiff or her other activities. The court does not conclude that the plaintiff's present summary process action is retaliatory and in violation of [§ 21-80a]."
Section 21-80a (b) specifies the circumstances in which a landlord's eviction action will not be deemed retaliatory if commenced within six months of the tenants engagement in certain protected activities. In addition to the grounds previously discussed, § 21-80a (b) provides in relevant part: "Notwithstanding the provisions of subsection (a) of this section, if permitted by subdivision (1) of subsection (b) of section 21-80, the owner may maintain an action to recover possession of the premises if ... (3) the owner seeks to recover possession pursuant to section 21-80 on the basis of a notice which was given to the resident before the resident's complaint." (Emphasis added.) Section 21-80 requires specific types of written notices that a landlord must provide to a tenant prior to eviction, depending on whether the tenant is a mobile home owner or renter and on the ground for eviction. Not only did the trial court fail to find that the plaintiff had given the defendants any type of written notice so required, the testimony clearly indicates that there was no other type of written notice.[18] The courts have no authority to expand the exceptions provided by the legislature.
Finally, I find it troubling that the trial court would rely on an action that had been withdrawn by the plaintiff prior to the defendants' engagement in protected activities as evidence of a lack of retaliatory motive. Had the defendants' conduct been so egregious as to require ousting them from the mobile park where they had resided for thirty years, one would have expected the plaintiff either to pursue the action to its conclusion or enter into an enforceable settlement of the dispute. Accordingly, the Appellate Court's judgment cannot be affirmed on the basis relied on by the trial court.
I respectfully dissent.
NOTES
[1] General Statutes § 21-80a provides in relevant part:

"(a) An owner shall not maintain an action or proceeding against a resident to recover possession of a dwelling unit or a mobile manufactured home space or lot, demand an increase in rent from the resident, or decrease the services to which the resident has been entitled within six months after: (1) The resident has in good faith attempted to remedy by any lawful means, including contacting officials of the state or of any town, city or borough or public agency or filing a complaint with a fair rent commission, any condition constituting a violation of any provision of this chapter or chapter 368o or of any other state statute or regulation, or of the housing and health ordinances of the municipality wherein the premises which are the subject of the complaint lie; (2) any municipal agency or official has filed a notice, complaint or order regarding such a violation; (3) the resident has in good faith requested the owner to make repairs; (4) the resident has in good faith instituted an action under subsections (a) to (i), inclusive, of section 47a-14h; or (5) the resident has organized or become a member of a residents' association.
"(b) Notwithstanding the provisions of subsection (a) of this section, if permitted by subdivision (1) of subsection (b) of section 21-80, the owner may maintain an action to recover possession of the premises if: (1) The resident is using the dwelling unit or the premises for an illegal purpose or for a purpose which is in violation of the rental agreement or for nonpayment of rent; (2) the condition complained of was caused by the wilful actions of the resident or another person in his household or a person on the premises with his consent; or (3) the owner seeks to recover possession pursuant to section 21-80 on the basis of a notice which was given to the resident before the resident's complaint...."
Although § 21-80a was the subject of certain technical amendments in 2007; see Public Acts 2007, No. 07-217, § 90; those amendments have no bearing on this appeal. In the interest of simplicity, we refer herein to the current revision of the statute.
[2] The initial question certified to this court, as well as lower court decisions, have referred to the protection offered by § 21-80a as a rebuttable presumption of retaliation. See, e.g., Correa v. Ward, 91 Conn.App. 142, 146, 881 A.2d 393 (2005) (construing analogous language in General Statutes §§ 47a-20 and 47a-20a of the Landlord and Tenant Act, General Statutes § 47a-1 et seq.).
[3] We granted the defendants' petition for certification, limited to the following issue: "Did the Appellate Court properly interpret ... § 21-80a (b)(1) as permitting a property owner to avoid the presumption of retaliatory eviction when its summary process action is based on resident conduct that is in violation of a material provision of the rental agreement?" Fairchild Heights, Inc. v. Dickal, 295 Conn. 908, 989 A.2d 602 (2010). After oral argument before this court, we directed the parties to submit supplemental briefs addressing the following issue: "Did the trial court properly determine that the defendants failed to establish a presumption of retaliatory eviction pursuant to ... § 21-80a?"
[4] Paragraph 12 of the lease agreement addressed the issue of a holdover tenancy and provides in relevant part: "In the event that the [r]esident shall at any time hold over the premises beyond the original term of the lease, such holding over shall be on all the same terms and conditions contained in this lease...."
[5] "At the time of the present summary process action, the residents association's lawsuit was pending in the trial court." Fairchild Heights, Inc. v. Dickal, supra, 118 Conn.App. at 166 n. 2, 983 A.2d 35.
[6] The defendants asserted that Nancy Dickal's involvement in the following activities triggered § 21-80a (a), thereby barring the plaintiff's summary process action: (1) the formation of the residents association; (2) the residents association's action against the plaintiff; and (3) good faith complaints filed with government agencies. Because we, like the Appellate Court, conclude that the exception under § 21-80a (b)(1) would permit the plaintiff to maintain the present summary process action even if the defendants had engaged in protected conduct, we need not reach the question of whether any of these activities would in fact satisfy § 21-80a (a).
[7] General Statutes § 21-80(b) provides in relevant part: "(1) Notwithstanding the provisions of section 47a-23, an owner may terminate a rental agreement or maintain a summary process action against a resident who owns a mobile manufactured home only for one or more of the following reasons:

"(A) Nonpayment of rent, utility charges or reasonable incidental services charges;
"(B) Material noncompliance by the resident with any statute or regulation materially affecting the health and safety of other residents or materially affecting the physical condition of the park;
"(C) Material noncompliance by the resident with the rental agreement or with rules or regulations adopted under section 21-70;
"(D) Failure by the resident to agree to a proposed rent increase, provided the owner has complied with all provisions of subdivision (5) of this subsection; or
"(E) A change in the use of the land on which such mobile manufactured home is located, provided all of the affected residents receive written notice (i) at least three hundred sixty-five days before the time specified in the notice for the resident to quit possession of the mobile manufactured home or occupancy of the lot if such notice is given before June 23, 1999, or (ii) at least five hundred forty-five days before the time specified in the notice for the resident to quit possession of the mobile manufactured home or occupancy of the lot if such notice is given on or after June 23, 1999, regardless of whether any other notice under this section or section 21-70 has been given before June 23, 1999; provided nothing in subsection (f) of section 21-70, section 21-70a, subsection (a) of this section, this subdivision and section 21-80b shall be construed to invalidate the effectiveness of or require the reissuance of any valid notice given before June 23, 1999...."
[8] Consideration of § 21-80a (b)(1) in relation to § 21-80(b)(1)(C) shows that the Appellate Court's broad interpretation of § 21-80a (b)(1) would not afford any additional protection to mobile home owners who engage in activities protected under § 21-80a (a). Specifically, the Appellate Court would allow a park owner to evict a resident in spite of the resident's protected conduct upon a showing that the resident had violated a material term of the rental agreement. Fairchild Heights, Inc. v. Dickal, supra, 118 Conn.App. at 173, 983 A.2d 35. If, however, the park owner had already established material noncompliance with the rental agreement to initiate the summary process action under § 21-80(b)(1)(C) in the first instance, it follows a fortiori that such material noncompliance would also constitute a "violation of a material provision of the rental agreement"; id.; thereby satisfying § 21-80a (b)(1). In effect, the requirements of §§ 21-80a (b)(1) and 21-80(b)(1)(C) would be coextensive.
[9] For example, the rental agreement in the present case requires residents to pay all applicable taxes and utility charges and to reimburse the owner if the owner is charged and to maintain liability insurance for the leased premises. It would strain the text of the statute to construe noncompliance with either of these provisions as a "[use of] the dwelling unit or the premises ... for a purpose which is in violation of the rental agreement...." General Statutes § 21-80a (b)(1). Accordingly, a resident who has engaged in conduct protected under § 21-80a (a) cannot be evicted for violating such provisions, even if the conduct is in material noncompliance with the rental agreement.
[10] General Statutes § 21-82 provides in relevant part:

"(a) At all times during the tenancy the owner shall ...
"(6) Make all repairs and do whatever is necessary to put and keep the portion of the mobile manufactured home park that is not the responsibility of each resident in a fit and habitable condition ...
"(7) Keep all common areas of the premises in a clean and safe condition ...
"(13) Maintain any road within the park in good condition, [and] provide adequate space for parking of two cars for each lot...."
[11] For purposes of § 21-80a, "`[p]remises'" is defined as "a dwelling unit and facilities and appurtenances therein and grounds, areas and facilities held out for the use of residents generally or whose use is promised to the resident...." General Statutes § 21-64(10). Thus, the fact that the trial court found that the defendants commonly parked their vehicles on the streets of the manufactured home park or on common property, and not solely on their own lot, does not remove their conduct from the operation of § 21-80a.
[1] General Statutes § 21-80a provides in relevant part:

"(a) An owner shall not maintain an action or proceeding against a resident to recover possession of a dwelling unit or a mobile manufactured home space or lot, demand an increase in rent from the resident, or decrease the services to which the resident has been entitled within six months after: (1) The resident has in good faith attempted to remedy by any lawful means, including contacting officials of the state or of any town, city or borough or public agency or filing a complaint with a fair rent commission, any condition constituting a violation of any provision of this chapter or chapter 368o or of any other state statute or regulation, or of the housing and health ordinances of the municipality wherein the premises which are the subject of the complaint lie; (2) any municipal agency or official has filed a notice, complaint or order regarding such a violation; (3) the resident has in good faith requested the owner to make repairs; (4) the resident has in good faith instituted an action under subsections (a) to (i), inclusive, of section 47a-14h; or (5) the resident has organized or become a member of a residents' association.
"(b) Notwithstanding the provisions of subsection (a) of this section, if permitted by subdivision (1) of subsection (b) of section 21-80, the owner may maintain an action to recover possession of the premises if: (1) The resident is using the dwelling unit or the premises for an illegal purpose or for a purpose which is in violation of the rental agreement or for nonpayment of rent; (2) the condition complained of was caused by the wilful actions of the resident or another person in his household or a person on the premises with his consent; or (3) the owner seeks to recover possession pursuant to section 21-80 on the basis of a notice which was given to the resident before the resident's complaint....
"(d) Nothing in this section shall be construed to in any way limit the defense provided in section 47a-33."
General Statutes § 47a-33, referred to in § 21-80a (d), provides a similar affirmative defense to that under § 21-80a (a) for summary process actions generally, but eliminates the six month period of protected activity and adds a requirement that the landlord must have brought the eviction action solely because the tenant attempted to remedy, by lawful means, any condition constituting a violation of certain statutes or regulations.
[2] Although, in its posttrial brief, the plaintiff claimed that the defendants had not proved that their complaints to various officials about the plaintiff had been filed in good faith, the plaintiff did not renew that claim in either its brief to the Appellate Court or its briefs to this court. Therefore, I assume that the plaintiff has abandoned this claim. See State v. Saucier, 283 Conn. 207, 223, 926 A.2d 633 (2007) (claim not raised on appeal deemed abandoned).
[3] General Statutes § 21-80(b)(1) provides in relevant part: "Notwithstanding the provisions of section 47a-23, an owner may terminate a rental agreement or maintain a summary process action against a resident who owns a mobile manufactured home only for one or more of the following reasons .. .

"(B) Material noncompliance by the resident with any statute or regulation materially affecting the health and safety of other residents or materially affecting the physical condition of the park;
"(C) Material noncompliance by the resident with the rental agreement or with rules or regulations adopted under section 21-70...." (Emphasis added.)
[4] Mobile park tenants who rent their homes can be evicted for conduct short of material noncompliance; see General Statutes § 21-80(a); but, as I later explain, it appears that it is typical for residents of mobile home parks to own their mobile home.
[5] In footnote 9 of its opinion, the majority cites two examples of conduct that would violate the rental agreement in the present case that does not involve active employment of the dwelling unit or the premises  nonpayment of applicable taxes and utility charges and failing to maintain liability insurance on the premises.
[6] General Statutes § 47a-23 (a)(F) authorizes an owner or lessor to serve a notice to quit when, inter alia, the tenant has violated General Statutes § 47a-11 or General Statutes 21-82(b), both of which contain numerous requirements relating to maintaining the property in a safe, clean and healthy manner. In particular, § 21-82(b)(1) requires the tenant to "[c]omply with all obligations primarily imposed upon residents by applicable provisions of any building, housing or fire code materially affecting health and safety...."
[7] Section 21-80(a) makes clear that the grounds and procedures for evicting tenants under § 47a-23 also apply to mobile park residents who rent their home.
[8] General Statutes § 47a-23c (a)(1) protects persons who are sixty-two years of age or older, blind, or seriously physically disabled, and who reside in a building or complex consisting of five or more separate dwelling units or who reside in a mobile manufactured home park. Under this statute, "[n]o landlord may bring an action of summary process or other action to dispossess a tenant described in subsection (a) of this section except for one or more of the following reasons ... (C) material noncompliance with section 47a-11 or subsection (b) of section 21-82, which materially affects the health and safety of the other tenants or which materially affects the physical condition of the premises...." (Emphasis added.) General Statutes § 47a-23c (b)(1).
[9] Indeed, in § 21-80a (a)(1), one activity that shields a mobile home owner from eviction is seeking legal redress for a landlord's violation of "health ordinances" as well other laws that protect the welfare of tenants from eviction. See also General Statutes § 47a-33 (providing similar protection for tenants).
[10] In the present case, the plaintiff served the notice to quit on September 8, 2007, filed its complaint on November 28, 2007, received notice of judgment in its favor on March 16, 2009, and still is awaiting the final resolution of this matter.
[11] Prior to a lease change in 2004, the plaintiff had an "unofficial rule" that permitted tenants to keep more than two vehicles at no additional fee. In 2004, the plaintiff changed its rule to one under which tenants could have two vehicles at no charge but would pay a fee for any additional vehicles. In 2007, the plaintiff again changed that rule to allow tenants who previously had parked additional vehicles to do so at no charge. Alan Dickal testified that he did not accept the new lease offered by the plaintiff, a condition of which was that the defendants must pay back fees, because the defendants did not think it was fair to be charged for the use of a lot for which they already were paying rent.
[12] The trial court stated as follows: "The defendants claim that the regulation is not reasonable; however [the plaintiff's president, Jeffrey] Doolan offered considerable testimony regarding the need to control the number of vehicles allowed as it effects [the plaintiff's] ability to efficiently operate maintenance equipment. Excess vehicles are commonly parked on common property or impinge upon the roads throughout the park, making snow removal and maintenance difficult."
[13] See, e.g., Board of Education v. Wallingford Education Assn., 271 Conn. 634, 640, 858 A.2d 762 (2004) (citing "the salutary purpose of the agreement's arbitration provision, namely, `to avoid the formalities, delay, expense and vexation of ordinary litigation'"); Pesino v. Atlantic Bank of New York, 244 Conn. 85, 94, 709 A.2d 540 (1998) (noting purpose of settlement agreement "is to provide for the sharing of future revenues with the defendant in exchange for the forgiveness of a significant portion of the plaintiff's promissory notes"); Levine v. Massey, 232 Conn. 272, 274, 654 A.2d 737 (1995) (purpose of separate agreement defining parties' obligations to each other in relation to their invention and licensing agreement "in part, was to distinguish between such future improvements on the basic invention or new inventions in which the parties would share equally, and those that would remain solely the property of the individual inventor"); Hess v. Dumouchel Paper Co., 154 Conn. 343, 351, 225 A.2d 797 (1966) ("[t]he purpose of the agreement, from the defendant's point of view, was to provide storage space for its inventory").
[14] I do not agree with the defendants, however, that the exception at issue applies only when the dwelling unit or the premises as a whole is used in violation of the rental agreement. There is no express requirement in the statute to that effect.
[15] The plaintiff did not seek to evict the defendants on the basis of nonpayment of rent. Jeffrey Doolan, the plaintiff's president, testified that he had billed the defendants for additional vehicles at one point but later stopped doing so.
[16] The defendants have not challenged the trial court's conclusion that the eviction otherwise properly could be brought, and therefore, I also must assume that the trial court's judgment includes an implicit, unchallenged finding that parking additional cars constitutes material noncompliance with the lease.
[17] The unchallenged testimony reveals that at least three persons of driving age resided at the defendants' home during the time in question and that all of the defendants' vehicles were insured and registered. The plaintiff's counsel expressly represented that the plaintiff was not claiming that any of the defendants' vehicles were creating any hazard, such as leaking oil, or that they were "eyesores."
[18] The plaintiff's president, Jeffrey Doolan, testified that he had made attempts to resolve the vehicle problem through "several meetings in person" with the defendants in 2004 and 2005, and thereafter had made offers to execute a new lease that would have permitted the defendants to keep three vehicles at no charge, subject to paying the back fees.