IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-29

No. COA21-310

Filed 18 January 2022

Iredell County, No. 19 JA 215

IN THE MATTER OF: A.P.

Appeal by respondent-mother from order entered 16 February 2021 by Judge

Carole A. Hicks in Iredell County District Court. Heard in the Court of Appeals 17

November 2021.

*Lauren Vaughan for Petitioner-Appellee Iredell County Department of Social Services.*

*Parent Defender Wendy C. Sotolongo, by Assistant Parent Defender J. Lee Gilliam, for Respondent-Appellant-Mother.*

*No brief filed for Respondent-Appellee-Father.*

*Womble Bond Dickinson (US) LLP, by Jessica L. Gorczynski, for Guardian ad Litem.*

CARPENTER, Judge.

¶ 1        Respondent-Mother appeals from a permanency planning order (the "Order"),

entered on 16 February 2021 following an initial permanency planning hearing. The

Order granted legal and physical custody of the juvenile to Respondent-Father;

ordered two hours of supervised visitation every other weekend to Respondent-

Mother, allowing Respondent-Father to choose the place and supervisor of visitation; and waived further review hearings. On appeal, Respondent-Mother argues the Order was not consistent with her need for reasonable accommodations based on her intellectual disability, and therefore, violated Title II of the Americans with Disabilities Act of 1990 ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"). Furthermore, she contends the Order gave Respondent-Father "too much discretion" over the visitation plan. For the reasons set forth below, we affirm the Order in part; we vacate and remand the visitation provisions of the Order for the trial court to enter an appropriate visitation plan.

## I. Factual & Procedural Background

¶ 2 On 19 November 2019, the date of A.P.'s birth, the Iredell County Department of Social Services ("DSS") received a report, from the hospital where Respondent-Mother gave birth, alleging neglect of A.P. on the basis Respondent-Mother has brain damage due to a past car accident and is unable to care for the newborn infant. On 6 December 2019, DSS filed a juvenile petition alleging A.P. was a neglected juvenile. The petition alleged Respondent-Mother failed to provide basic care for the infant—including changing diapers and feeding—even with hands-on assistance from hospital staff. The petition further alleged Respondent-Mother was under the guardianship of her paternal aunt, S.L., who had cared for her since she was four years old and was the payee on Respondent-Mother's disability benefits. Respondent-

Mother was reported as being previously diagnosed with "mild mental retardation" and as having an IQ similar to that associated with a ten-year-old child. The petition described an emergency assessment held by DSS on 22 November 2019 in which Respondent-Mother admitted to participating in concerning behaviors including having unsafe, one-time sexual encounters with men whom she met online and intentionally killing cats. The assessment also revealed Respondent-Mother was jealous of the attention A.P. received from S.L., and Respondent-Mother had been found in her room with a knife explaining she "was going to hurt herself and just wanted to make everything go away." The day after the assessment, Respondent-Mother and A.P. were released from the hospital to the care of S.L. Respondent-Mother and S.L. signed a safety plan in which Respondent-Mother agreed to be supervised at all times when with A.P., and S.L. agreed to provide "eyes-on" supervision.

¶ 3        On 15 January 2020, a hearing was held for determining whether a guardian *ad litem* should be appointed for Respondent-Mother. At the hearing, DSS made an oral motion to appoint a guardian *ad litem* in accordance with N.C. Gen. Stat. § 1A-1, Rule 17 for Respondent-Mother. The trial court found*, inter alia*, Respondent-Mother: is incompetent and cannot adequately act in her own interest, waived notice of the hearing and consented to the appointment of a guardian *ad litem* for her, is incompetent within the meaning of N.C. Gen. Stat. § 35A-1101 (2019), and lacks

capacity due to mental retardation. Accordingly, the trial court appointed a guardian *ad litem* for Respondent-Mother.

¶ 4 On 12 February 2020, pre-adjudication and adjudication hearings were held before the Honorable Edward L. Hedrick, IV. On the same day, the trial court entered its adjudication order, making findings of fact by clear and convincing evidence and concluding A.P. was a neglected juvenile. A dispositional hearing was also held on 12 February 2020. The guardian *ad litem* for A.P. filed a court report for the dispositional hearing in which she expressed concerns for A.P. continuing to live with S.L. and Respondent-Mother. She noted "if [S.L.'s] belittling behavior [toward Respondent-Mother] continues or escalates, the nexus of [Respondent-Mother's] mental deficit, jealousy, and propensity for violence will push [Respondent-Mother] to the limits of her tolerance and result in harm to [A.P.]". The guardian *ad litem* recommended A.P. be placed with S.L. and a new guardian be found for Respondent-Mother.

¶ 5 On 12 February 2020, the trial court entered its dispositional order in which it found, *inter alia*, that the primary conditions in the home that led to or contributed to the juvenile's adjudication and to the Court's decision to remove custody of the juvenile are the Respondent-Mother's mental health status and her inability to provide care for the infant juvenile. It further found that placement of A.P. with S.L. would be in the juvenile's best interest. The trial court concluded, *inter alia*, DSS

made reasonable efforts to reunify and to prevent the need for placement of the juvenile outside of the juvenile's own home. The trial court then ordered, *inter alia*, Respondent-Mother remedy the conditions in the home that led to or contributed to the juvenile's adjudication and to the Court's decision to remove custody of the juvenile by: (1) entering into and complying with the terms of a case plan; (2) cooperating with DSS and the guardian *ad litem*; (3) signing all releases of information necessary for DSS and the guardian *ad litem* to exchange information with their providers and monitor progress; (4) providing DSS and the guardian *ad litem* with a comprehensive list of all living adult relatives; and (5) not living in the home of A.P. The trial court also ordered legal and physical custody of A.P. to DSS and supervised visitation to Respondent-Mother for two hours per week.

¶ 6    On 8 July 2020, a review hearing was held pursuant to N.C. Gen. Stat. § 7B-906.1(a) (2019). The trial court entered an order the same day, finding, *inter alia*, Respondent-Mother had entered but not completed a case plan, and DSS had become aware of a potential father whom it found to be a potential placement provider for the juvenile. The trial court then concluded that legal and physical custody of the juvenile should continue with DSS. While paternity results were pending, the trial court allowed the putative father ("Respondent-Father") to have two-hour weekly unsupervised visits with A.P. and continued supervised visitation for Respondent-Mother. On 24 July 2020, Respondent-Father confirmed paternity of A.P. and

entered into a case plan with DSS.  DSS held a child and family team meeting on 28 July 2020 and placed A.P. with Respondent-Father and the paternal grandmother.

¶ 7        On 27 August 2020, Dr. George Popper, Ph.D., P.A., ("Dr. Popper") performed a comprehensive psychological evaluation on Respondent-Mother as requested by her 12 March 2020 DSS case plan, which consisted of multiple examinations to determine her cognitive and academic achievements, social-emotional development, personality, parenting skills, and mental health status.   Respondent-Mother performed "extremely low" in the areas tested in the cognitive assessment.  She received a full-scale IQ of 53 on the Weschsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), which falls in the "intellectually disabled – moderate" range.  Her test results on her mental status assessment were consistent with depression and anxiety disorder.  In Dr. Popper's view, it was "unrealistic for [Respondent-Mother] to assume the role of full-time parent" because "[s]he has not yet demonstrated she has the skills needed for self-care, nor has she demonstrated the skills needed to care for a young child."  Based on the examinations, Dr. Popper recommended Respondent-Mother to: (1) continue with supervised visits and with her parenting classes and modify visits if progress is noted; (2) attend individual counseling and possibly seek medication for her depression and anxiety; (3) train to improve domestic skills; (4) obtain innovation services; and (5) find a supported work placement or placement in a sheltered workshop.

¶ 8    An initial permanency planning hearing was held on 20 January 2021 before the Honorable Carole A. Hicks.  Social worker Latoya Daniels testified Respondent-Mother participated in Pharo's Parenting parent classes and parental coaching program for at least four months.  DSS also offered Respondent-Mother the opportunity to be placed at the Thelma Smith Foundation, an assisted living facility, where she could work on "independent skills" and learn how to provide her basic needs, which she declined.

¶ 9    Krista McMillan, a foster care supervisor with DSS also testified.  According to Krista McMillan, Respondent-Mother did not want to participate in the services of the Thelma Smith Foundation although they were offered to her, and DSS set up an intake appointment.  DSS made referrals for Respondent-Mother to receive mental health treatment at Daymark; Respondent-Mother also declined those services.  Additionally, DSS assisted Respondent-Mother with applying for innovation services, as recommended by Dr. Popper.

¶ 10    The remainder of the testimony during the permanency planning hearing focused primarily on Respondent-Mother's visitation with A.P.  According to Respondent-Father, A.P. had lived with him in the paternal grandmother's home since the end of July 2020.  Respondent-Father has held consistent employment, has had no issues providing care for A.P., and feels bonded with A.P.  When Respondent-Father was asked by counsel for DSS if he would be willing to facilitate visits or

supervise visits for Respondent-Mother, he replied, "I mean, due to the past, I don't [sic] willing just because of, you know, prior history. So I kind of stay away from everything." Although Respondent-Father confirmed he did not want to supervise visits for Respondent-Mother himself, he did testify that his mother and other friends or family would be willing to supervise visits. On cross-examination, Respondent-Father testified he did not want Respondent-Mother to be part of A.P.'s life due to allegations she harmed the child, and he did not want Respondent-Mother to have supervised visits.

¶ 11        On 16 February 2021, the trial court entered the permanency planning Order, which granted legal and physical custody of A.P. to Respondent-Father and awarded supervised visitation to Respondent-Mother every other weekend for a minimum of two hours, giving Respondent-Father discretion to choose the location and supervisor of the visitation. Respondent-Mother gave timely notice of appeal.

## II.   Jurisdiction

¶ 12        This Court has jurisdiction to address Respondent-Mother's appeal from the Order pursuant to N.C. Gen. Stat. § 7A-27(b)(2) (2019) and N.C. Gen. Stat. § 7B-1001(a)(4) (2019).

## III.   Issues

¶ 13        The issues before the Court are whether: (1) the trial court's findings of fact support its conclusion of law that DSS made reasonable efforts to unify and to

eliminate the need for placement of the juvenile in light of Respondent-Mother's intellectual disability; (2) the trial court's finding of fact regarding DSS's reasonable efforts are supported by competent evidence; (3) the trial court made reasonable accommodations for Respondent-Mother, consistent with ADA and Section 504 requirements; (4) the trial court erred in allowing A.P.'s father to choose the place and supervisor of visitation; and (5) the trial court erred in waiving future reviews and informing all parties of their right to file a motion for review of the ordered visitation plan given Respondent-Mother's disability.

## IV.    Standard of Review

¶ 14        "Appellate review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and the findings support the conclusions of law." *In re J.C.S.*, 164 N.C. App. 96, 106, 595 S.E.2d 155, 161 (2004) (citation omitted). "The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *In re L.M.T.*, 367 N.C. 165, 168, 752 S.E.2d 453, 455 (2013) (citation omitted).

## V.    Permanency Planning Order

¶ 15        On appeal, Respondent-Mother argues DSS failed to make the necessary accommodations for her under the ADA and Section 504 when making efforts to reunify and eliminate the need for placement of the juvenile outside the juvenile's own home. Specifically, Respondent-Mother asserts she "was entitled to reunification

services specially tailored to accommodate her intellectual disability." For the reasons set forth below, we are unpersuaded by Respondent-Mother's arguments relating to the ADA and Section 504.

## A. DSS's Compliance with the ADA and Section 504 when Making Reasonable Efforts

¶ 16    The parties do not dispute Respondent-Mother has a disability within the meaning of the ADA and Section 504 and is a qualified individual with a disability eligible for protection under these statutes.

¶ 17    Section 504 and Title II of the ADA "protect parents and prospective parents with disabilities from unlawful discrimination in the administration of child welfare programs, activities, and services." U.S. Dep't Health & Human Servs. & U.S. Dep't Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, (Aug. 2015), https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html. The ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination of any such entity." 42 U.S.C. § 12132. The ADA defines a "qualified individual with a disability" as

> an individual with a disability who, with or without
> reasonable modifications to rules, policies, or practices, the

> removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131. Likewise, Section 504 provides: "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

### 1. *Sufficiency of Conclusion regarding DSS's Reasonable Efforts*

¶ 18        We first consider whether there are findings of fact to support the trial court's conclusion that DSS made reasonable efforts to prevent the need for placement of A.P. This Court has previously considered ADA protections afforded to parents in the context of the Juvenile Code. In *In re C.M.S.*, we addressed the issue of whether the ADA precludes the State from terminating parental rights of an intellectually disabled parent. 184 N.C. App. 488, 646 S.E.2d 592 (2007). After considering persuasive authority from other jurisdictions, we held the ADA does not prevent the State's termination of parental rights so long as the trial court made its statutorily required findings to show "the department of social services has made reasonable efforts to prevent the need for placement of the juvenile." *Id.* at 491–93, 646 S.E.2d

at 594–95; *see also* N.C. Gen. Stat. § 7B-507(a)(2) (2019). Thus, when a department of social services, such as DSS in the instant case, satisfies this requirement, it complies with the ADA's mandate that individuals with disabilities be reasonably accommodated. *Id.* at 492–93, 646 S.E.2d at 595. We noted "Congress enacted the ADA to eliminate discrimination against people with disabilities and to create causes of action for qualified people who have faced discrimination. Congress did not intend to change the obligations imposed by unrelated statutes." *Id.* at 492, 646 S.E.2d at 595 (citations omitted).

¶ 19        We find the holding of *In re C.M.S.* on point in the case *sub judice. Id.* at 491, 646 S.E.2d at 594; s*ee also In re S.A.*, 256 N.C. App. 398, 806 S.E.2d 81 (2017) (unpublished) (rejecting a respondent-parent's argument that the trial court ignored the requirements of the ADA and Section 504 when it awarded custody of the juvenile to the child's father because the trial court made the proper findings under N.C. Gen. Stat. § 7B-507(a)(2) in its permanency planning order). Because the trial court in this case concluded "DSS has made reasonable efforts to reunify and to eliminate the need for placement of the juvenile," it necessarily complied with the ADA's directive that a parent not be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program." *See In re C.M.S.*, 184 N.C. App. at 492–93, 646 S.E.2d at 595; *see also* 42 U.S.C. § 12132. Additionally, we find this conclusion of law is supported by findings of fact 5, 6, and 8, which state:

5.   [DSS] made reasonable efforts to reunify and to eliminate the need for placement of the juvenile outside of the juvenile's own home. Said efforts are as described in the social worker's report and prior court orders.

6.   DSS has made reasonable efforts to identify an appropriate permanent plan for the juvenile. Said efforts are as described in the social worker's report and the prior court orders. DSS initiated DNA testing to determine paternity in this matter; approved [Respondent-Father's] home for placement; monitored [Respondent-Father's] trial home placement; made referrals for [Respondent-Mother] to complete her case; attempted to engage [Respondent-Mother] in services specifically recommended in the Parenting Assessment by Dr. Popper; attempted to monitor [Respondent-Mother's] compliance with her case plan and progress on completing the objectives in the Parenting Assessment.

. . . .

8.   DSS attempted to enroll [Respondent-Mother] at the Thelma Smith Foundation in Salisbury to no avail. The Thelma Smith Foundation would provide training in domestic skills, help [Respondent-Mother] with transportation and employment, and provide [Respondent-Mother] with some level of independence. [Respondent-Mother] has continued to attend parenting classes and have her visits supervised by parenting skills teachers, yet she still is unable to consistently and properly change the juvenile's diaper and feed him.

¶ 20    The record and transcripts reveal DSS made reasonable efforts, consistent with Dr. Popper's recommendation, to assist Respondent-Mother with her supervised visits, mental health issues, parenting and home skills, and innovation services; thus,

these findings of fact are supported by competent evidence.

### 2. Sufficiency of Factual Findings

¶ 21    Respondent-Mother next challenges findings of fact 6, 12, 13, and 15, on the ground these findings are unsupported by competent evidence. We disagree and consider each finding in turn.

### a. Finding of Fact 6

¶ 22    Finding of fact 6 states in pertinent part, "[DSS] made referrals for [Respondent-Mother] to complete her case [and] attempted to engage [Respondent-Mother] in services specifically recommended in the Parenting Assessment by Dr. Popper . . . ."

¶ 23    As stated above, social worker Latoya Daniels and foster care supervisor Krista McMillan testified as to the services to which Respondent-Mother was referred including parenting coaching and classes, mental health services, supervised visitation, innovation services, and assisted living where Respondent-Mother could learn independent skills. These services were consistent with those recommended by Dr. Popper. We conclude finding of fact 6 is supported by competent evidence. *See In re J.C.S.*, 164 N.C. App. at 106, 595 S.E.2d at 161.

### b. Finding of Fact 12

¶ 24    Finding of fact 12 states in pertinent part: "Respondent Mother is not making adequate progress within a reasonable period of time under the plan."

Respondent-Mother expressly declined mental health services and services to assist her in improving independent skills despite Dr. Popper's finding that she suffered from depression and anxiety, lacked basic parenting skills, and was unable to live independently. Additionally, social worker Latoya Daniels testified that DSS "had attempted to . . . assist [Respondent-Mother] to the best of [its] ability at this point" through Pharos parenting classes. Placing a diaper on the child, a basic skill, had been "cover[ed] for a significant amount of time." Therefore, Respondent-Mother's argument is without merit. We conclude there was competent evidence in the record to support finding of fact 12. *See In re J.C.S.*, 164 N.C. App. at 106, 595 S.E.2d at 161.

### c. *Finding of Fact 13*

Finding of fact 13 states in pertinent part, "Respondent Mother is not actively participating in or cooperating with the plan, DSS, and the GAL for the juvenile."

Respondent-Mother argues finding of fact 13 is a conclusory finding not supported by the evidence. We disagree. The trial court determined a fact of consequence, that Respondent-Mother had not actively participated in or cooperated with her case plan, DSS, and the guardian *ad litem* for the juvenile—and this finding is supported by competent evidence. The guardian *ad litem's* 20 January 2021 court report stated Respondent-Mother had not complied with DSS requests to maintain visits nor the court's orders to adhere to a case plan and was "combative on the topic

of information flow" during the case review meeting. The guardian *ad litem* concluded Respondent-Mother "continues to have shown little growth in her ability to care for a child." The testimony of the social workers also supports this finding. Therefore, we conclude finding of fact 13 is supported by competent evidence. *See In re J.C.S.*, 164 N.C. App. at 106, 595 S.E.2d at 161.

   d. *Finding of Fact 15*

¶ 28 Finding of fact 15 states in pertinent part, "The Court finds by clear and convincing evidence that the Respondent Mother is acting in a manner inconsistent with the health or safety of the juvenile."

¶ 29 In DSS's 20 January 2021 court summary prepared for the permanency planning hearing, it reported there were continuing "concerns regarding diaper changes and feedings." Additionally, Dr. Popper noted in his August 2020 assessment Respondent-Mother had not demonstrated skills needed to care for the juvenile child or herself and has a history of threatening self-harm. He further stated, "her limited cognitive resources, her lack of basic parenting skills, her emotional stability, and her inability to live independently are issues that impact her ability to safely and responsibly care for a young child at this time." We conclude finding of fact 15 is supported by competent evidence.

¶ 30 Although there may have been evidence to support findings to the contrary, we hold findings of fact 5, 6, 8, 12, 13, and 15 are "supported by . . . competent evidence,"

and therefore, are conclusive on appeal. *See In re L.M.T.*, 367 N.C. at 168, 752 S.E.2d at 455.

**B. Adequacy of Services under the ADA**

¶ 31        Next, Respondent-Mother challenges the adequacy of services offered by DSS in its case plan and at the permanency planning hearing. DSS and the guardian *ad litem* for A.P. contend Respondent-Mother waived the issue of ADA compliance by DSS because she failed to challenge the adequacy of services before or during the permanency planning hearing. After careful review, we conclude Respondent-Mother waived her argument on this issue by failing to raise it in a timely manner after receiving services under her DSS case plan.

¶ 32        In the unpublished case of *In re S.A.*, our Court adopted the reasoning found in *In re Terry*, 240 Mich. App. 14, 27, 610 N.W.2d 563, 570–71 (2000) to hold the respondent-parent waived her argument as to adequacy of services offered by DSS. *In re S.A.*, 256 N.C. App. 398, 806 S.E.2d 81, 2017 N.C. App. LEXIS 906, at *6. We also cited to *In re Terry* as persuasive authority in our published case of *In re C.M.S.*, 184 N.C. App. at 492–93, 646 S.E.2d at 595, discussed *supra*. In *In re S.A.*, the respondent-parent did not participate in the services offered by DSS. *In re S.A.*, 256 N.C. App. 398, 806 S.E.2d 81, 2017 N.C. App. LEXIS 906, at *6–7. In holding the respondent-mother waived her argument on appeal, we reasoned that at no time did she object to the adequacy of the services being offered by DSS—neither before nor

during the permanency planning hearing. *Id.* at *6.

Respondent-Mother attempts to distinguish *In re S.A.* from the instant case on the grounds the parent in *In re S.A.* "had a physical disability rather than an intellectual one." This argument is without merit. We are again persuaded by the Michigan Court of Appeals case of *In re Terry*. 240 Mich. App. at 26, 610 N.W.2d at 570. In *In re Terry*, the respondent-parent alleged she was a "qualified individual with a disability" as defined by the ADA because of her intellectual limitations. The court in *In re Terry* stated "[a]ny claim that the [social services agency] is violating the ADA must be raised in a timely manner . . . so that any reasonable accommodations can be made." 240 Mich. App. at 26, 610 N.W.2d at 570. Further, "[t]he time for asserting the need for accommodation in services is when the court adopts a service plan . . . ." *Id.* at 27, 610 N.W.2d at 571. The *In re Terry* court concluded that the respondent-parent's challenge of the accommodations in the closing argument of the termination of parental rights proceeding was "too late . . . to raise the issue." *Id.* at 27, 610 N.W.2d at 570–71.

Here, Respondent-Mother, like the mothers in *In re S.A.* and *In re Terry*, cannot show she raised an issue regarding the adequacy of services provided by DSS before or during the permanency planning hearing; therefore, we hold Respondent-Mother waived her argument by raising it for the first time on appeal. *See In re S.A.*, 256 N.C. App. 398, 806 S.E.2d 81, 2017 N.C. App. LEXIS 906, at *6; *In re Terry*, 240

Mich. App. at 27, 610 N.W.2d at 570–71.

**C. Visitation Order**

¶ 35 In her next argument, Respondent-Mother maintains the trial court's visitation order "was not an adequate accommodation for an individual with an intellectual disability" because it gave A.P.'s father and custodian too much discretion by allowing him to choose the place and the supervisor of visitation. She contends "this Court should remand the dispositional order for entry of an order that grants [her] appropriate visitation at a consistent location, to be supervised by a neutral third party." In light of our case precedent, we agree the trial court improperly gave Respondent-Father substantial discretion to choose the location and supervisor for Respondent-Mother's visitation; however, we reject Respondent-Mother's contention that the visitation order did not provide her with reasonable accommodations, because she failed to provide any support for that argument. *See* N.C. R. App. P. 28(b)(6) ("The body of the argument . . . shall contain citations of the authorities upon which appellant relies.").

¶ 36 We review visitation determinations for abuse of discretion. *In re C.M.*, 183 N.C. App. 207, 215, 644 S.E.2d 588, 595 (2007). "When reviewing for abuse of discretion, we defer to the trial court's judgment and overturn it only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *In re K.W.*, 272 N.C. App. 487, 495, 846 S.E.2d 584, 590 (2020) (citation omitted).

¶ 37    In decree 3 of the Order, the trial court mandated in pertinent part:

> The Respondent Mother shall be entitled to visit with the
> juvenile for a minimum of two hours every other weekend.
> These visits shall be supervised by [Respondent Father] or
> someone he approves. If the visiting Respondent Parent
> and the custodial Respondent Parent cannot agree
> regarding the specifics, visits shall take place from Noon-
> 2pm at allocation [sic] [Respondent Father] chooses.
> [Respondent Father] shall arrange transportation for the
> juvenile to and from visits. Additionally, [Respondent
> Mother] shall be entitled to visitation of two hours
> surrounding major holidays such as Thanksgiving and
> Christmas. The Parents may agree on different times,
> locations, and frequency of visits if they desire.

¶ 38    N.C. Gen. Stat. § 7B-905.1 provides:

> (a) An order that removes custody of a juvenile from a
> parent . . . shall provide for visitation that is in the best
> interests of the juvenile consistent with the juvenile's
> health and safety, including no visitation."
> . . . .
> (c) If the juvenile is placed or continued in the custody or
> guardianship of a relative or other suitable person, *any
> order providing for visitation shall specify the minimum
> frequency and length of the visits and whether the visits
> shall be supervised.* The court may authorize additional
> visitation as agreed upon by the respondent and custodian
> or guardian.

N.C. Gen. Stat. § 7B-905.1(a), (c) (2019) (emphasis added).

¶ 39    We stated in *In re Custody of Stancil*:

> When the custody of a child is awarded by the court, it is
> the exercise of a judicial function. [N.C. Gen. Stat. §] 50-
> 13.2. In like manner, when visitation rights are awarded,
> it is the exercise of a judicial function. We do not think that

> the exercise of this judicial function may be properly delegated by the court to the custodian of the child. Usually those who are involved in a controversy over the custody of a child have been unable to come to a satisfactory mutual agreement concerning custody and visitation rights. To give the custodian of the child authority to decide when, where and under what circumstances a parent may visit his or her child could result in a complete denial of the right and in any event would be delegating a judicial function to the custodian.

10 N.C. App. 545, 552, 179 S.E.2d 844, 849 (1971).

¶ 40    Here, the Order specified the minimum frequency—every other weekend—as well as the length of visits—two hours. Furthermore, the Order specified that the visits shall be supervised. Therefore, the Order met the minimum requirements for a visitation plan under N.C. Gen. Stat. § 7B-905.1.

¶ 41    Nevertheless, Respondent-Mother cites to *In re C.S.L.B.*, 254 N.C. App. 395, 400, 829 S.E.2d 492, 495 (2017) and *In re J.D.R.*, 239 N.C. App. 63, 75–76, 768 S.E.2d 172, 180 (2015) in arguing that the visitation plan in the Order must be reversed because it gives Respondent-Father too much discretion over her visits.

¶ 42    In *In re C.S.L.B.*, this Court vacated a visitation order because it "improperly delegate[d] the court's judicial function to the guardians by allowing them to unilaterally modify [r]espondent-mother's visitation" by deciding if there was a "concern" she was using substances. 254 N.C. App. at 400, 829 S.E.2d at 495. In *In re J.D.R.*, we concluded the visitation plan "delegate[d] to [the respondent-father]

substantial discretion over the kinds of visitation" the respondent-mother would receive. 239 N.C. App. at 75, 768 S.E.2d. at 179. Additionally, the order placed conditions on the respondent-mother's visitation rights and gave respondent-father discretion to decide whether the respondent-mother "complied with the trial court's directives." *Id.* at 75, 768 S.E.2d at 179.

¶ 43     After careful review, we agree the trial court improperly gave Respondent-Father substantial discretion over the circumstances of Respondent-Mother's visitation by allowing him to choose the location and supervisor of the visitation. *See In re J.D.R.*, 239 N.C. App. at 75, 768 S.E.2d at 179 (concluding the trial court's "disposition order delegates to [respondent-father] substantial discretion over [some] kinds of visitation" by allowing him to determine whether the respondent-mother could eat lunch with the minor child at his school); *In re K.W.*, 272 N.C. App. at 496, 846 S.E.2d at 591 ("We have consistently held that [t]he court may not delegate [its grant of] authority [over visitation] to the custodian.") (internal quotation marks omitted). Moreover, Respondent-Father testified he was not willing to facilitate or supervise Respondent-Mother's visits and did not want Respondent-Mother to be part of A.P.'s life. This is precisely the scenario we cautioned against in *Stancil*: the trial court's grant of authority to a custodian-parent to decide the circumstances of the other parent's visitation plan, which could completely deny that parent of his or her right to visit with the minor child. *See In re Custody of Stancil*, 10 N.C. App. at 552,

179 S.E.2d at 849. Therefore, we hold the trial court's visitation order improperly delegated a judicial function to Respondent-Father by allowing him the sole discretion to decide where and by whom Respondent-Mother would be supervised during her visitations with the minor child. We vacate the visitation order and remand to the trial court for a proper visitation plan.

**D. Future Review Hearings**

¶ 44    In her final argument, Respondent-Mother asserts the trial court erred by waiving further review hearings pursuant to N.C. Gen. Stat. § 7B-906.1 because such a result "does not comport with fundamental fairness, the ADA, or A.P.'s best interest." She further contends the trial court erred by "[m]erely informing" the parties of their right to file a motion for review of the visitation plan by notifying the parties in writing in the Order. As such, Respondent-Mother argues the Order should be remanded to require regular review hearings and continuous appointment of a guardian *ad litem* for Respondent-Mother for the pendency of the juvenile proceeding. We disagree.

¶ 45    N.C. Gen. Stat. § 7B-906.1(k) provides: "[i]f at any time a juvenile has been removed from a parent and legal custody is awarded to either parent . . ., the court shall be relieved of the duty to conduct periodic judicial reviews of the placement." N.C. Gen. Stat. § 7B-906.1(k) (2019). N.C. Gen. Stat. § 7B-905.1(d) states "[i]f the court waives permanency planning hearings and retains jurisdiction, all parties shall

be informed of the right to file a motion for review of any visitation plan entered pursuant to this section." N.C. Gen. Stat. § 7B-905.1(d) (2019).

¶ 46 Here, the trial court stated in its visitation decree of the Order that "[a]ll parties are informed of the right to file a motion for review of this visitation plan. Upon motion of any party and after proper notice and a hearing, the Court may establish, modify, or enforce a visitation plan that is in the juvenile's best interest." It also retained jurisdiction and notified the parties that "no further regular review hearings [are] scheduled" after awarding legal custody to Respondent-Father.

¶ 47 In *In re C.M.S.* we adopted the rule followed by a majority of jurisdictions that "termination proceedings are not 'services, programs or activities' under the ADA." 184 N.C. App. at 491, 646 S.E.2d at 595 (citations omitted); *see* 42 U.S.C. § 12132. Similarly, we conclude abuse, neglect, and dependency proceedings are not "services, programs or activities" within the meaning of the ADA, and therefore, the ADA does not create special obligations in such child protection proceedings. *See In re Joseph W.*, 305 Conn. 633, 651, 46 A.3d 59, 69–70 (2012) (stating the ADA does not act as a defense or create special obligations in neglect proceedings); *M.C. v. Dep't of Child. & Families*, 750 So. 2d 705 (Fla. Dist. Ct. App. 2000) (explaining dependency proceedings are held for the benefit of the child rather than the parents; thus, parents may not assert the ADA as a defense in such a proceeding); 42 U.S.C. § 12132.

¶ 48 We hold the trial court met the statutory requirements set out in N.C. Gen.

Stat. § 7B-906.1(k) and N.C. Gen. Stat. § 7B-905.1(d), and the ADA did not "change the obligations imposed by [these] unrelated statutes." *See In re C.M.S.*, at 492, 646 S.E.2d at 595.

## VI.    Conclusion

¶ 49      We affirm the Order in part because the trial court's findings of fact are supported by competent evidence, and the findings of fact in turn support its conclusions of law.  We hold Respondent-Mother waived her argument regarding the adequacy of services provided by DSS by raising the issue for the first time on appeal. We vacate the visitation portion of the Order and remand for entry of an order prescribing a proper visitation plan, because the court's order on visitation gives Respondent-Father substantial discretion to decide the circumstances of Respondent-Mother's visits.  Finally, we hold the trial court met the statutory requirements imposed by N.C. Gen. Stat. § 7B-906.1(k) and N.C. Gen. Stat. § 7B-905.1(d), and the ADA does not expand the trial court's obligations to Respondent-Mother under those sections.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judges INMAN and ZACHARY concur.